IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| MOHAMED MAGASSOUBA, | ) | |
| | ) | Case No. 8:23-cv-767 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | DEMAND FOR JURY TRIAL |
| | ) | |
| (1) PRINCE GEORGE'S COUNTY, | ) | |
| (2) ANGELA LANE, | ) | |
| individually and in her official capacity, | ) | |
| (3) JEFFREY W. WALDEN, | ) | |
| individually and in his official capacity, | ) | |
| (4) SUNNY A. MROTEK, | ) | |
| individually and in his official capacity, | ) | |
| (5) ROBBIE W. LOVEDAY, | ) | |
| individually and in his official capacity, | ) | |
| and | ) | |
| (6) SHAWNE J. WADDY, | ) | |
| individually and in her official capacity, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**COMPLAINT**

Plaintiff Mohamed Magassouba ("Mr. Magassouba"), for his complaint against

Defendants Prince George's County ("Defendant PGC"), Angela Lane ("Defendant Lane"),

Jeffrey W. Walden ("Defendant Walden"), Sunny A. Mrotek ("Defendant Mrotek"), Robbie W.

Loveday ("Defendant Loveday"), and Shawn J. Waddy ("Defendant Waddy") (collectively,

"Defendants"), alleges the following:

1.      Despite their best efforts, good police officers are unable to succeed in a toxic and

corrupt police department culture that values loyalty over integrity, and that which prioritizes

protecting fellow officers over serving and protecting the community. These officers are often

subject to retaliation and ostracization when they attempt to hold their colleagues accountable for

misconduct, leaving them with little recourse but to remain silent or leave the department altogether.

2.      Officer Magassouba is one of the many police officers who prioritizes integrity and protecting the public over institutional loyalty. But when you are an officer of color employed by the Prince George's County Police Department ("PGCPD"), choosing integrity over institutional loyalty comes with a hefty price. For Officer Magassouba, that price was his job.

3.      The PGCPD has long had a persistent problem of White officers engaging in racist conduct towards officers of color and civilians of color, and a troubling history of engaging in retaliatory actions against officers of color who file complaints or otherwise cooperate with efforts to investigate misconduct by White officers.

4.      Despite his years of stellar service and performance within the PGCPD, Officer Magassouba's troubles began when he refused to lie to protect a White police officer who used an unjustified amount of force during *an unlawful arrest* of a civilian of color—specifically, a Black female who was simply walking home from the store one night with her son. The son recorded the unfortunate encounter with his cellphone, a copy of which was later posted online to the DMV Black Lives Matter Twitter page and reproduced here: https://youtu.be/gUrVvrIeQTs.

5.      Officer Magassouba commenced this action to seek redress for: (a) the unlawful discriminatory and retaliatory actions taken against him by Defendants that culminated in his wrongful termination; and (b) the hostile work environment he was forced to endure at the PGCPD for nearly 30 months, which caused him to suffer significant financial harm and detrimentally impacted his physical health and mental wellbeing.

6.     Officer Magassouba's claims arise under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e to 2000e-17, Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981, Section 1983 of the Civil Rights Act of 1871, 42 U.S.C. § 1983, Section 1985(3) of the Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), and the laws of the State of Maryland.

## JURISDICTION AND VENUE

7.     The Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343(a)(3) because this case involves questions of federal law and because Officer Magassouba seeks damages for violations of his civil rights.

8.     The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a) because the claims form part of the same case or controversy under Article III of the United States Constitution. The state law claims share all common operative facts with Officer Magassouba's federal law claims, and the parties are identical. Resolving Officer Magassouba's federal and state claims in a single action serves the interests of judicial economy, convenience, consistency, and fairness to the parties.

9.     Venue is proper in this Court under 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practices were committed in this judicial district, the relevant employment records are maintained in this judicial district, and there is no other judicial district that has substantial connection to Officer Magassouba's claims. Venue is also proper in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims herein arose within this judicial district.

**THE PARTIES**

10.     Plaintiff Mohamed Magassouba is an African immigrant who was previously employed by the PGCPD as a police officer. Officer Magassouba graduated from Bowie State University with a Bachelor of Science degree in Criminal Justice and Sociology. Officer Magassouba resides within Prince George's County, Maryland.

11.     Defendant Prince George's County is a municipal corporation duly organized and existing under the laws of the State of Maryland. Prince George's County is the proper party in suits asserted against the PGCPD, and is named as a defendant to Counts 1, 2, 3, 4, 10, 11, 12, and 13.

12.     Defendant Angela Lane is a Black female who is or was employed by PGCPD as a Lieutenant. Defendant Lane is named in her official capacity to Counts 1, 2, 3, 4, 10, 11, 12, and 13, and she is named in her individual capacity to Counts 5, 6, 7, 8, 9, and 14. Upon information and belief, Defendant Lane resides within King George County, Virginia.

13.     Defendant Jeffrey W. Walden is a White male who is or was employed by PGCPD as a Captain. Defendant Walden was one of three officials who comprised Mr. Magassouba's Command Staff at the PGCPD. Defendant Walden is named in his official capacity to Counts 1, 2, 3, 4, 10, 11, 12, and 13, and he is named in her individual capacity to Counts 7, 8, 9, and 14. Upon information and belief, Defendant Walden resides within Anne Arundel County, Maryland.

14.     Defendant Sunny A. Mrotek is a White male who is or was employed by PGCPD as a Captain. Defendant Mrotek was one of three officials who comprised Mr. Magassouba's Command Staff at the PGCPD. Defendant Mrotek is named in his official capacity to Counts 1, 2, 3, 4, 10, 11, 12, and 13, and he is named in her individual capacity to Counts 7, 8, 9, and 14.

Upon information and belief, Defendant Mrotek resides within Prince George's County, Maryland.

15.     Defendant Robbie W. Loveday is a White male who is or was employed by PGCPD as a Lieutenant. Defendant Loveday was one of three officials who comprised Mr. Magassouba's Command Staff at the PGCPD. Defendant Loveday is named in his official capacity to Counts 1, 2, 3, 4, 10, 11, 12, and 13, and he is named in his individual capacity to Counts 7, 8, 9, and 14. Upon information and belief, Defendant Loveday resides within Sussex County, Delaware.

16.     Defendant Shawne J. Waddy is a Black female who is or was employed by PGCPD as a Major. Defendant Waddy was one of three officials who comprised Mr. Maggassouba's Command Staff at the PGCPD. Defendant Waddy is named in his official capacity to Counts 1, 2, 3, 4, 10, 11, 12, and 13, and she is named in her individual capacity to Counts 7, 8, 9, and 14. Upon information and belief, Defendant Waddy resides within Charles County, Maryland.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

17.     On May 26, 2022, Officer Magassouba filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). (See Exhibit 1, Charge of Discrimination filed by Officer Magassouba)

18.     On or about June 1, 2022, the EEOC referred the complaint to the Civil Rights Division of the United States Department of Justice ("CRD").

19.     On December 29, 2022, the CRD issued Officer Magassouba a notice informing him of his right to institute this action within 90 days from the date of the notice. (See Exhibit 2, CRD Notice dated December 29, 2022).

20.     Officer Magassouba has fully complied with all prerequisites for this Court to assume jurisdiction over his Title VII claims.

**BACKGROUND FACTS**

21.     On August 30, 2010, Officer Magassouba began working as a police officer with the PGCPD.

22.     Officer Magassouba worked as a police officer with the PGCPD for more than eleven years before he was terminated on August 14, 2021. At the time of his termination, Mr. Magassouba obtained the title of "Corporal," and his immediate supervisor was Defendant Lane.

23.     During the first nine years of his employment with the PGCPD, Officer Magassouba received positive reviews on his Past Performance Appraisal (PPA) reports and twice received the "PGCPD Police Officers of the Month" award.

24.     Officer Magassouba's troubles began in the PGCPD only after he refused to sacrifice his integrity and morals to cover up misconduct committed by a White officer. Coincidently, only then did Officer Magassouba receive a negative PPA, which the PGCPD later changed in connection with an appeal.

25.     Because the Defendants were unable to attack Officer Magassouba's stellar workplace performance, they covertly launched an unjustified investigation into Officer Magassouba's background and then falsely charged Officer Magassouba with providing "falsifications" and "omissions" in a Personal History Statement he submitted on September 9, 2009. Specifically, the Defendants claimed that Officer Magassouba violated "Prince George's County Personnel Code 16-193(c)(A)(iv)" by allegedly providing "falsifications, and omissions with respect to prior police interactions [he] had with the Alexandria (VA) Police Department on *December 6, 2001* and the Metropolitan (DC) Police Department on *July 1, 2004*."

26.     Defendants manufactured the charges filed against Officer Magassouba in a malicious effort to terminate his employment, which they succeeded in doing. Over the course of nearly 30 months immediately prior to his termination, Defendants unlawfully targeted Officer Magassouba with a parade of adverse employment actions and subjected him to a toxic and hostile work environment, all because Officer Magassouba would not lie to protect a White officer who unlawfully assaulted, detained, and arrested a Black female civilian in January 2019.

### The Unreasonable Escalation of Force Incident

27.     In January 2019, while working in District 3 (now District 7), Officer Magassouba was dispatched to respond to a report of disorderly conduct at an individual's personal residence in Capitol Heights, Maryland. The complainant called 9-1-1 and reported that two "suspicious looking" individuals were following her daughter outside of their residence.

28.     Officer Magassouba was the first of two officers to respond on scene to the call. He met the complainant at her residence and asked for a more detailed description of the two individuals. The complainant told Officer Magassouba that the two individuals were Black males dressed in all black attire. Officer Magassouba thanked the complainant and informed her that he would canvass the area.

29.     While canvassing the neighborhood, Officer Magassouba noticed two individuals walking along the road wearing black attire, but he decided not to approach the individuals because neither of them acted unusual upon seeing Officer Magassouba drive by in his cruiser.

30.     At the same time, Officer Justin Loewke arrived on the scene and began canvassing the area. Officer Loewke observed the same two individuals Officer Magassouba previously observed walking alongside the road, but Officer Loewke decided to position his cruiser next to the two individuals to perform a closer inspection. At that point, one of the two

individuals flashed their middle finger at Officer Loewke, which then led to him parking the cruiser and shouting at the Black female that she was under arrest.

31.    While approaching the Black female to effect the arrest, Officer Loewke pressed the red button on his radio, which alerts dispatch when an officer is in trouble or needs backup. Being the closest officer in the immediate vicinity, Officer Magassouba was instructed to report to the scene to assist Officer Loewke.

32.    Before Officer Magassouba arrived on the scene, Officer Loewke physically grabbed the Black female and shoved her to the ground. The female repeatedly asked Officer Loewke to explain why he was physically touching her and arresting her, but Officer Loewke did not provide an explanation. Officer Loewke grabbed his taser gun and pointed it at the female after he threw her to the ground. Officer Loewke then pointed his taser gun at the female's son.

33.    Officer Magassouba then arrived on the scene to find Officer Loewke on top of the Black female with his taser gun drawn and pointed at the female's son. While Mr. Magassouba was speaking with the son and trying to figure out what was happening, another police cruiser arrived on the scene and another White male police officer got on top of the Black female with Officer Loewke to affect the arrest. The female's son recorded the events that transpired using his cellphone.

34.    The Black female had just finished her shift at work, and she was walking to and from the store with her son when Officer Loewke shoved her to the ground and placed her under arrest. Officer Loewke did not have reasonable suspicion to stop the Black female, nor did he have probable cause to arrest her. Officer Loweke's escalation of force during the incident was unlawful.

35.    Officer Loewke arrested the Black female and transported her to Upper Marlboro Corrections for processing. The female was charged with disorderly conduct, trespassing, and hindering an arrest. Officer Loewke did not have probable cause to arrest the Black female.

Upon information and belief, Officer Loewke falsified the charges against the Black female to cover up the unlawfulness of the arrest and the unlawfulness of his use of force.

36.     Because use of force occurred during the arrest, Officer Magassouba's supervisor instructed him to draft a witness statement, which he did. For the next several days thereafter, things remained normal at work for Officer Magassouba.

37.     Then, on January 30, 2019, a recording of the incident, taken from the son's cellphone, was posted online to the DMV Black Lives Matter Twitter page, a copy of which has been reproduced here: https://youtu.be/gUrVvrIeQTs (hereinafter referred to as, the "Viral Video"). The Viral Video garnered a lot of public attention, which led to the PGCPD launching an investigation into the incident.

38.     In early February 2019, Officer Magassouba was approached by Defendants Waddy, Mrotek, and Loveday (collectively referred to as "the Command Staff Defendants"), who advised Officer Magassouba that the Chief of Police, Hank Stawinski, was very disappointed by the safety procedures he used during the incident.  The Command Staff Defendants also made clear to Officer Magassouba that they too were very disappointed with him.

39.     During the encounter, Defendant Loveday questioned Officer Magassouba about his reasons for not arresting the Black female's son. In response, Officer Magassouba said he did not have authority to arrest the son. Defendant Loveday barked at the response and told Officer Magassouba that all the issues arising from Viral Video could have been quashed if he had just simply arrested the son. Defendant Loveday told Officer Magassouba that he was directly responsible for all the negative publicity and chaos coming into the PGCPD as a result of the Viral Video. Officer Magassouba again asked Defendant Loveday to identify the appropriate

charge or authority that would have allowed him to arrest the son. In response, Defendant Loveday said, "disorderly conduct." Officer Magassouba reminded Defendant Loveday that (i) the incident occurred at 1:00 a.m. outside of a church, (ii) no one else was in the area, and (iii) an individual cannot commit disorderly conduct against a law enforcement officer. Defendant Loveday then asked Officer Magassouba to explain why he did not arrest the son for hindering an arrest. In response, Officer Magassouba said, "what, for hindering his own arrest?" Defendant Loveday ordered Officer Magassouba to leave the office.

40. During the same encounter with the Command Staff Defendants, all three strongly encouraged and pressured Officer Magassouba to change his witness narrative statement so it would support Officer Loewke's use of force in effecting the arrest of the Black female. The Command Staff Defendants wanted Officer Magassouba to lie on the witness statement so that the narrative matched Officer Loewke's arrest paperwork. Officer Magassouba refused to do so, at which point the Command Staff Defendants became visibly frustrated and then started to take adverse employment actions against Officer Magassouba.

41. That same day, Officer Magassouba contacted the Fraternal Order of Police-89 (FOP) to inform his union representatives of the hostile encounter he had with the Command Staff Defendants and to notify the FOP about the Viral Video. Later that day, while off-duty, Officer Magassouba was informed by his first-line supervisor, Corporal Decatur Thompson, that he was being immediately reassigned to a desk position and would no longer work the street.

42. The reassignment to the desk position materially altered the terms and conditions of Officer Magassouba's employment because it was an objectively less prestigious assignment and afforded Officer Magassouba significantly less opportunity for growth.

43.    The next day, Officer Magassouba arrived at work and assumed his new duties as a desk officer. While at work, Officer Magassouba's first-line supervisor informed him that the Command Staff Defendants unanimously agreed to send Officer Magassouba for retraining at the Police Academy. Officer Magassouba acquiesced to the instruction. Meanwhile, Officer Loewke began working for a specialized unit called SAT team, a unit viewed very favorably by other officers within the PGCPD.

44.    Officer Magassouba continued working as a desk officer for approximately two weeks while awaiting reassignment to the Police Academy. During those two weeks, Officer Magassouba sought mental health services from Joy Preston, Director of Phycological Services Division of the PGCPD. Officer Magassouba sought the mental health services because of the high levels of stress and anxiety he was experiencing from the way he was being treated and managed within the PGCPD following the posting of the Viral Video.

45.    Ms. Preston instructed Officer Magassouba to take the next two-to-three days off from work, which Officer Magassouba relayed to his first-line supervisor. While Officer Magassouba was at home on orders from Ms. Preston, Defendant Waddy called Officer Magassouba's personal cellphone to inquire into why he did not report to work. Officer Magassouba had never spoken to Defendant Waddy prior to this call. Officer Magassouba informed Defendant Waddy that Ms. Preston had instructed him to take two-to-three days off from work and that he relayed those instructions to his first-line supervisor. In response, Defendant Waddy began yelling at Officer Magassouba.

46.    Upon information and belief, Defendant Waddy acted in a hostile manner towards Officer Magassouba because of his race and/or national origin. Defendant Waddy never

questioned or challenged the White police officers under her supervision about their decision to take time-off from work.

47.     In March 2019, Officer Magassouba arrived at the Police Academy in Upper Marlboro, Maryland to complete the retraining ordered by the Command Staff Defendants. Upon arriving at the Academy, Officer Magassouba met with the Lieutenant and Corporal in charge of training. They invited Officer Magassouba into a classroom to further discuss why he was at the Academy. Officer Magassouba told the Lieutenant and Corporal about the arrest incident in January 2019 and the hostile actions being taken against him by the Command Staff Defendants after a recording of the incident was published online. The Lieutenant and Corporal both agreed that Officer Magassouba acted properly under the circumstances and told him that there was no legitimate reason to keep him at the Academy. They both instructed Officer Magassouba to return to his unit and informed him that they would send an official email to Officer Magassouba's chain of command.

48.     That same day, Officer Magassouba returned to his station as a desk officer in District 3. Officer Magassouba's first-line supervisor approached him to let him know that Defendant Waddy wanted to speak with him. Defendant Waddy asked Officer Magassouba to describe the events that occurred at the Police Academy. Officer Magassouba responded that everything turned out fine and that the training instructors discharged him. In response, Defendant Waddy said, "no, tell me in detail everything that happened at the Academy." Officer Magassouba repeated that everything turned out to be fine and then asked Defendant Waddy if she had received an email from the training instructors. Defendant Waddy confirmed that she had in fact received the email and then proceeded to read the email to Officer Magassouba. The

contents of the email confirmed exactly what Officer Magassouba had relayed to Defendant
Waddy.

49.     That same day, after his shift had ended, Corporal Decatur Thompson called
Officer Magassouba to inform him that he would be back on the street immediately, but assigned
to the callsign H5. The PGCPD has a pattern or practice of assigning callsign H5 to brand new or
rookie police officers because it places the assignee in high-crime areas to obtain more
experience. At the time, Officer Magassouba was the senior officer on the squad (which
consisted of 11 to 12 officers) and should not have been assigned to callsign H5. Officer
Magassouba acquiesced to the news and instructions from Corporal Thompson.

50.     The next day, Officer Magassouba assumed duties as a street officer under
callsign H5 (also known as "the rookie beat"). Officer Magassouba contacted the FOP again to
inform his union representatives that the PGCPD was unlawfully targeting him and that he
believed the chain of command would soon be retaliating against him based on the current
treatment he was receiving. The FOP told Officer Magassouba that it would start searching for
another District to see if a reassignment would be a possible solution.

51.     For the next three months, Officer Magassouba continued to work the rookie beat
under callsign H5. During this time, Officer Magassouba was subjected to the following actions:

    a.  Officer Magassouba was disciplined by Defendant Walden for not
        wearing the appropriate boots one day. However, another non-Black
        officer was wearing the exact same boots as Officer Magassouba but
        was not disciplined. Corporal Thompson informed Defendant Walden
        that a separate officer was wearing the exact same boots as Officer
        Magassouba and inquired whether that officer would also be disciplined
        in the same manner as Officer Magassouba. In response, Defendant
        Walden said, "nah, I am just going to handle Magassouba." Corporal
        Thompson informed Officer Magassouba about Defendant Walden's
        response.
    b.  On a separate occasion, Defendant Walden asked Officer Magassouba and
        Corporal Hawkins to express how they felt as Black officers in the squad in

comparison to the other non-Black officers. They informed Defendant Walden that, as Black officers, they did not feel as though they were being treated equally compared to the other officers. Specifically, Officer Magassouba and Corporal Hawkins relayed that they believe Black officers receive much harsher disciplinary actions for the same violations or infractions committed by White officers. They also informed Defendant Walden about troubling conduct being carried out by one officer in particular (a White female), who purposely avoided taking calls on her beat (i.e., calls coming in from dispatch for H2). After providing the information to Defendant Walden, Officer Magassouba's work conditions drastically changed. He was micromanaged on a daily basis in a way that similar situated White officers in the squad were not, including those who were subordinate to him.

### *Defendant Angela Lane's Unlawful Conduct*

52.    In the third quarter of 2019, Officer Magassouba was transferred to District 5 and assumed patrol duties. His supervisor at District 5 was Defendant Lane.

53.    Shortly after the reassignment, Officer Magassouba had a conversation with Defendant Lane about traveling back to Africa one day. Defendant Lane responded that she would never visit Africa. When Officer Magassouba asked why, Defendant Lane responded that she "disliked" and "could not tolerate African men" because "they" are very "aggressive, controlling, and do not respect women." Officer Magassouba told Defendant Lane that he was African but that he does not demonstrate those types of behaviors. Defendant Lane then responded with "you are all the same."

54.    In a separate conversation, Defendant Lane told Officer Magassouba that she did not trust him as a police officer because of the January 2019 incident involving Officer Loewke. In response, Officer Magassouba asked Defendant Lane why she accepted his transfer to her squad in District 5. Defendant Lane replied that she wanted Officer Magassouba to be obedient to a female supervisor.

55.    In December 2019 or January 2020, Officer Magassouba requested two weeks of annual leave for travel occurring in April 2020. Officer Magassouba was planning to go to Dubai

for his 10-year marriage anniversary. Defendant Lane approved one week and denied the second week, citing a lack of manpower. Officer Magassouba informed Defendant Lane that he would still be in Dubai for the second week, which would result in him being listed as AWOL (absence without official leave). In response, Defendant Lane stated, "that's not my problem." Officer Magassouba then contacted the FOP for assistance with the situation. The FOP told Officer Magassouba that it would take care of the matter by having the chain of command instruct Defendant Lane to approve his leave. The FOP also noted that Officer Magassouba does not take a lot of leave and always shows up on time so there was no justifiable reason for Defendant Lane to deny his leave.

56.    The chain of command instructed Defendant Lane to approve Officer Magassouba's leave request for the second week. Defendant Lane told other officers in her squad that she was extremely frustrated that the chain of command was forcing her to approve Officer Magassouba's leave request. Several of the officers in the squad informed Officer Magassouba about the statements made by Defendant Lane. Upon information and belief, Defendant Lane did not deny leave requests submitted months in advance by White police officers.

57.    On September 21, 2020, a White officer was dispatched to an alarm call with another officer. Defendant Lane then called into dispatch and said she had a special assignment for the White officer and asked for the call to be reassigned to Officer Magassouba. Officer Magassouba cleared the alarm call, and upon his return, he asked the White officer about the special assignment that Defendant Lane had given him. The White officer informed Officer Magassouba that there was no special assignment, and that Defendant Lane made the call so he could study for his Corporal promotion exam. Defendant Lane did not offer the same benefit to Officer Magassouba while he was studying for his Sergeant exam.

58.     On September 29, 2020, Officer Magassouba was informed by another officer that Defendant Lane had listed Officer Magassouba as AWOL in the database for not showing up to work while he was on sick leave. Officer Magassouba previously provided Corporal Luis Morales, his first-line supervisor, with a doctor's note to support the request for his sick leave. Despite receiving the doctor's note, Defendant Lane felt that the paperwork submitted by Officer Magassouba was not adequate. Officer Magassouba then reached out to the FOP again and spoke with Sherrice Carpenter about the matter. Ms. Carpenter agreed to investigate the situation. Upon information and belief, Defendant Lane had never listed any of the White officers in her squad as AWOL in connection with a sick leave request.

59.     In October 2020, Officer Magassouba was dispatched to a call reporting sexual assault at a nursing home located in Clinton, Maryland. Officer Magassouba reported to the scene and was in the nursing home elevator while dispatch was trying to contact him. Upon exiting the elevator, Officer Magassouba immediately responded to the dispatch unit, informing them about the lack of cellular service in the elevator. Defendant Lane then sent Corporal Morales to the scene to validate Officer Magassouba's story. The supervisor entered the elevator to determine whether Officer Magassouba was telling the truth about the lack of cellular service, and then reported back to Defendant Lane that Officer Magassouba was telling the truth. Upon information and belief, Defendant Lane never challenged or tested the veracity of similar statements made by the other officers in her squad, none of whom were African immigrants.

60.     On November 12, 2020, Officer Magassouba experienced some minor damage to his cruiser caused by the impact of a small rock while traveling northbound on I-495. Officer Magassouba reported the damage to Corporal Morales, who in turn informed Defendant Lane. Defendant Lane then designated a subordinate White officer to obtain a duress statement from

Officer Magassouba, even though Officer Magassouba was the officer's superior. Officer Magassouba felt extremely uncomfortable during the interview and could not finish it.

61.      That same day, Officer Magassouba contacted legal counsel at the FOP, who informed Officer Magassouba that he would represent him during the duress statement interview. Approximately a week later, the FOP attorney arrived at Officer Magassouba's office location and represented him during the duress statement interview, which was then conducted before his immediate supervisor, not the subordinate officer. At the conclusion of the interview, Officer Magassouba received a reprimand from Defendant Lane. Defendant Lane did not subject the White officers in her squad to the same level of scrutiny or discipline them for reporting damage to a police cruiser.

62.      Upon information and belief, Defendant Lane never previously assigned a subordinate officer within her squad to take a duress statement from a White superior officer.

63.      On November 13, 2020, Corporal Morales volunteered to pick him up from his residence while the cruiser was in the repair shop. Upon arriving to work, Officer Magassouba informed Corporal Morales that he accidentally left his weapon at home. Corporal Morales said, "no problem" and instructed Officer Magassouba to go retrieve the weapon from his home. Officer Magassouba did so. The next day, Officer Magassouba received a written reprimand from Defendant Lane  for leaving his weapon at home. Other police officers in Defendant Lane's squad had left their weapons at home on several different occasions, but she never disciplined any for doing so. Officer Magassouba was the only African immigrant under Defendant Lane's supervision.

64.      On November 15, 2020, Officer Magassouba was dispatched to call reporting the presence of an armed person. Officer Magassouba arrested the individual for emergency petition

service (EPS) and transported him to PGC Hospital. Officer Magassouba worked overtime that day and placed a request for overtime the next day, but Defendant Lane denied the request. Other officers in the squad who submitted overtime requests were not challenged or questioned by Defendant Lane about the requests as she would routinely approve such requests. Defendant Lane rejected Officer Magassouba's request for overtime pay because of his status as an African male immigrant.

65.    On November 24, 2020, the police squad was divided into two groups—Group A and Group B. Officer Magassouba was assigned to Group B and was paired with another officer to conduct patrols. That evening, around 7:00 p.m., Officer Magassouba and the officer received a phone call from Defendant Lane with instructions to immediately report to District 3 (now District 7) to run "calls" (i.e., to be available to respond to dispatch calls). Group A was told to go home. The officer paired with Officer Magassouba expressed a great sense of frustration about the egregious extent of the harassment and negative treatment being directed towards Officer Magassouba, and the officer complained about how Defendant Lane's inappropriate conduct was now impacting his quality of life. The officer told Officer Magassouba that he believed Officer Magassouba's status as an African male immigrant was the cause of the inappropriate conduct and mistreatment.

66.    On November 29, 2020, Officer Magassouba and another officer were dispatched to respond to a call reporting the presence of a dead body. While responding to that matter, Corporal Morales called him and instructed Officer Magassouba to return to the police unit to secure a weapon from an individual who had randomly showed up requesting to surrender it. Officer Magassouba immediately arrived at the police station to facilitate the request. The supervisor and the rest of the day shift went home. Officer Magassouba stayed past his normal

shift to complete the weapon drop, which was facilitated by the evening shift supervisors. The next day, Officer Magassouba requested two hours of overtime pay as compensation for the extra hours worked the prior day. Defendant Lane denied the overtime pay request without providing a reason or justification for doing so. Defendant Lane denied Officer Magassouba's request for overtime pay because of his status as an African male immigrant.

67.    Around this time, Defendants Loveday and Walden informed Officer Magassouba that he was receiving all these negative actions and mistreatment because he was "not a team player." The supervisors specifically referenced Officer Magassouba's refusal to change his witness statement in connection with the January 2019 incident.

68.    On or about December 20, 2020, the Director of Psychological Services for the PGCPD, Joy Preston, sent a letter to Capitan Ross regarding concerns about Officer Magassouba's health and quality of life stemming from "elevated levels of stress" related to issues connected with Defendant Lane. In the letter, Ms. Preston requested that the chain of command provide Officer Magassouba with "a written plan of the steps that will be taken to improve the communication with his chain of command, and what will be done to avoid conflicts in the future." The letter went on to state that:

> With [Officer Magassouba]'s physical issues being documented by his Primary Care Physician, it would behoove the department to also have documentation detailing a plan of action of how his specific work-related concerns are being addressed. This will help to demonstrate the department's commitment to the overall health and wellness of [Officer Magassouba], and subsequently all employees.

69.    On December 31, 2020, Officer Magassouba  was called to report for an internal investigation with Internal Affairs ("IA"). He was presented with seven charges, but only two were ultimately sustained.  The IA investigator informed Officer Magassouba that she could not discuss the details of the investigation with anyone. However, other officers in Defendant Lane's

squad knew about the charges and informed Officer Magassouba that discussions were occurring about him with respect to the charges.

70.     The PGCPD instituted the internal investigation against Officer Magassouba because of the complaints he made to Ms. Preston and to the FOP. Upon information and belief, the PGCPD did not initiate internal investigations against White officers for similar conduct.

71.     On or about January 12, 2021, Officer Magassouba was suspended by the PGCPD, with pay. As part of the suspension, Officer Magassouba was reassigned to the evidence storage facility as a civilian and performed administrative work during the suspension. He was told that the suspension would afford the IA investigator time to investigate the charges. The suspension materially altered the terms and conditions of Officer Magassouba's employment by eliminating his ability to earn holiday or overtime pay, restricting his ability to take leave, significantly inhibiting his opportunity for advancement and/or promotions, rendering him ineligible for secondary employment, and placing him an objectively less prestigious position. Attached hereto as Exhibit 3 is a true and correct copy of the Discretionary Suspension Notice.

72.     On July 23, 2021, the PGCPD Chief of Police, Malik Aziz, sent Officer Magassouba a Notice of Intent of Administrative Action ("NIAA"), which stated, in part, the following:

> On or about August 3, 2020, the Department became aware of material facts that show that you provided falsifications, and omissions in your official Personal History Statement submitted on September 9, 2009. The falsifications, and omissions relate to answers you provided to questions about police interactions. Specifically, you provided falsifications, and omissions with respect to prior police interactions you had with the Alexandria (VA) Police Department on December 6, 2001 and the Metropolitan (DC) Police Department on July 1, 2004.

73.     Attached hereto as Exhibit 4 is a true and correct copy of the NIAA referenced in paragraph 71.

74.     The allegations against Officer Magassouba in the NIAA were false or made with a reckless disregard for the truth. Defendants conspired to investigate Officer Magassouba's background, without any justification for doing so, in hopes of obtaining information that may support their intent to terminate his employment with the PGCPD. The falsifications and omissions that Defendants allege Officer Magassouba made were from police interactions that occurred more than 17 years prior to the date of the NIAA.

75.     On July 26, 2021, Chief Aziz issued Officer Magassouba a letter notifying him that he would be immediately removed from administrative duty and placed on administrative leave. Being placed on administrative leave materially altered the terms and conditions of Officer Magassouba's employment with the PGCPD by significantly restricting or eliminating employment benefits he was entitled to receive, inhibiting his opportunity for advancement and/or promotions, and impairing his ability to seek future employment at an equivalent salary and position. Attached hereto as Exhibit 4 is a true and correct copy of the Administrative Leave Notice.

76.     A White officer from IA delivered a copy of the Administrative Leave Notice to Officer Magassouba and demanded that he sign the letter to acknowledge receipt. Upon being presented with the letter, Officer Magassouba requested to have his attorney present to review the letter, which was refused by the Internal Affairs officer. The IA officer also threatened Officer Magassouba with a charge of subordination if he did not sign the letter. When Officer Magassouba again requested to have his attorney present, the officer notated at the bottom of the letter that Officer Magassouba refused to sign the letter.

77.    On August 5, 2021, Officer Magassouba sent a letter to Chief Aziz appealing the administrative leave decision. Despite his appeal submission, Officer Magassouba was never afforded a hearing before the Administrative Hearing Board or other internal review body. Upon information and belief, the PGCPD afforded White officers who appealed similar decisions with the opportunity to have a hearing before the Administrative Hearing Board.

78.    On August 10, 2021, Officer Magassouba received a termination letter from the PGCPD. The termination letter did not adequately provide Officer Magassouba with notice of his due process rights with respect to the termination decision. Attached hereto as Exhibit 5 is a true and correct copy of the letter.

79.    Upon information and belief, Officer Magassouba was not provided with adequate notice of his due process rights, in part, because of the complaints he made to the FOP and because of his refusal to lie to cover up the misconduct by Officer Loweke during the January 2019 incident. Upon information and belief, the PGCPD provided White officers adequate notice of their due process rights upon receiving similar termination letters.

80.    On August 14, 2021, Officer Magassouba's termination became effective.

81.    Upon information and belief, the PGCPD has not terminated White officers for similar conduct.

82.    In February 2022, Officer Magassouba began working as a police officer with the Capitol Heights Police Department in Prince George's County, Maryland. The Capitol Heights Police Department is a separate entity from the PGCPD.

83.    Since engaging in the misconduct in January 2019, Officer Loewke received one or more promotions and favorable assignments while employed by the PGCPD.

## <u>COUNT I</u>
### Defendants' Unlawful Discrimination Based on Race/Ethnicity & National Origin, in Violation of Title VII of the Civil Rights Act of 1964

84.     Officer Magassouba incorporates herein by reference the allegations set forth in paragraphs 10 through 83.

85.     Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), prohibits employment discrimination on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a).

86.     Officer Magassouba's status as an African male immigrant is a protected class under Title VII.

87.     Defendants subjected Officer Magassouba to an adverse employment action when they terminated his employment on August 14, 2021. Defendants subjected Officer Magassouba to several other adverse employment actions when they engaged in the conduct or caused the results referenced in paragraphs 25, 41, 43, 49, 55, 57, 58, 61, 63, 64, 66, 70, 71, 72, 75, 78, and 80.

88.     Officer Magassouba's race and/or national origin was a motivating factor that prompted Defendants' decision to terminate Officer Magassouba's employment and the other actions referenced in paragraphs 25, 41, 43, 49, 55, 57, 58, 61, 63, 64, 66, 70, 71, 72, 75, 78, and 80.

89.     Officer Magassouba's status as an African male immigrant was a motivating factor for the adverse employment actions taken against him by Defendant Lane, referenced in paragraphs 49, 55, 57, 58, 61, 63, 64, and 66.

90.     Officer Magassouba suffered damages because of the Defendants' actions, including pecuniary losses and severe emotional distress.

91.     Defendants' actions were the actual and proximate cause of Officer Magassouba's damages.

92.     Defendants acted with malice or with reckless indifference towards Officer Magassouba's federally protected rights.

## <u>COUNT II</u>
### Defendants' Unlawful Retaliation in Violation of Title VII of the Civil Rights Act of 1964

93.     Officer Magassouba incorporates herein by reference the allegations set forth in paragraphs 10 through 83.

94.     Title VII forbids an employer from retaliating against an employee because of the employee's opposition to "any practice made an unlawful practice" by Title VII, or the employee's participation in "an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a).

95.     Officer Magassouba engaged in protected activity under Title VII by taking the actions referenced in paragraphs 41, 50, 55, 58, 60, 69, 70, 76, and 77.

96.     Defendants took one or more materially adverse actions against Officer Magassouba by engaging in the conduct referenced in paragraphs 25, 41, 43, 49, 55, 57, 58, 61, 63, 64, 66, 69, 70, 71, 72, 75, and 78.

97.     Each action referenced in paragraph 96 materially altered the terms and conditions of Officer Magassouba's employment with the PGCPD.

98.     Defendants took the actions against Officer Magassouba because he engaged in the protected activity referenced in paragraphs 41, 50, 55, 58, 60, 68, and 77.

99.     Defendants' actions may have likely dissuaded a reasonable employee in Officer Magassouba's position from making or supporting a charge of discrimination.

100.    Officer Magassouba suffered damages because of the adverse employment actions taken by Defendants.

<u>**COUNT III**</u>
**Hostile Work Environment by Defendants,**
**in Violation of Title VII of the Civil Rights Act of 1964**

101.    Officer Magassouba incorporates herein by reference the allegations set forth in paragraphs 10 through 83.

102.    Title VII prohibits an employer from subjecting an employee to a hostile work environment based upon the employee's race, religion, sex, or national origin.

103.    Defendants intentionally discriminated against Officer Magassouba because of his race and/or ethnicity. Defendant Lane intentionally discriminated against Officer Magassouba because of his status as an African male immigrant.

104.    Defendants' conduct was persistent and occurred frequently between February 2019 and August 2021, as reflected in the allegations set forth in paragraphs 25, 41, 43, 45, 48, 49, 51, 53, 54, 55, 57, 58, 59, 60, 61, 63, 64, 65, 66, 69, 70, 71, 72, 75, and 78.

105.    Officer Magassouba did not welcome Defendants' conduct.

106.    Defendants' conduct created a hostile work environment for Officer Magassouba. The conduct occurred frequently, unreasonably interfered with Officer Magassouba's work performance, and created a discriminatory abusive working environment for Officer Magassouba that detrimentally affected his health and wellbeing.

107.    Officer Magassouba found Defendants' conduct to be intimidating, hostile, and offensive.

108.    Defendants' conduct created a work environment that a reasonable person in Officer Magassouba's position would have found to be intimidating, hostile, or offensive.

109.    Defendants' supervisors knew, or in the exercise of reasonable care should have known, about the hostile work environment.

110.    Defendants' supervisors failed to take prompt remedial action to eliminate the hostile work environment.

111.    Officer Magassouba suffered damages because of the hostile work environment created by Defendants.

## COUNT IV
### Retaliatory Hostile Work Environment by Defendants, in Violation of Title VII of the Civil Rights Act of 1964

112.    Officer Magassouba incorporates herein the allegations set forth in paragraphs 10 through 83, above.

113.    Title VII prohibits an employer from subjecting an employee to a hostile work environment created by retaliatory conduct.

114.    Defendants engaged in persistent retaliatory conduct towards Officer Magassouba from January 2019 through August 2021, as referenced in paragraphs 25, 41, 43, 45, 48, 49, 51, 55, 57, 58, 59, 60, 61, 63, 64, 65, 66, 69, 70, 71, 72, 75, 78, and 80.

115.    Officer Magassouba did not welcome the Defendants' retaliatory conduct.

116.    Defendants' actions may have likely dissuaded a reasonable worker in Officer Magassouba's position from making or supporting a charge of discrimination.

117.    Officer Magassouba suffered damages because of Defendants' retaliatory actions.

## COUNT V
### Defendant Lane's Violation of the Equal Protection Clause of the Fourteenth Amendment (42 U.S.C. § 1983)

118.    Officer Magassouba incorporates herein by reference the allegations set forth in paragraphs 10 through 83, and 104.

119.    The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits discrimination against public employees based on race or sex, and it prohibits a public employer from subjecting an employee to a racially or sexually hostile work environment.

120.    Defendant Lane harassed Officer Magassouba because of his status as an African male immigrant.

121.    Officer Magassouba did not welcome Defendant Lane's conduct that targeted his status as an African male immigrant.

122.    Defendant Lane's conduct created a racially and sexually hostile work environment for Officer Magassouba.

123.    Defendant Lane intentionally committed acts, personally or by directing others, that created a racially and sexually hostile work environment for Officer Magassouba, as alleged in paragraphs 53, 54, 57, 58, 59, 60, 61, 63, 64, 65, and 66.

124.    Defendant Lane's conduct was frequent, persistent, and materially altered the terms or conditions of Officer Magassouba's employment. The conduct created a discriminatory abusive working environment for Officer Magassouba based on his race and sex.

125.    A reasonable person in Officer Magassouba's position would have found Defendant Lane's conduct to be intimidating, hostile, or offensive.

126.    Officer Magassouba found Defendant Lane's conduct to be intimidating, hostile, and offensive.

127.    Defendant Lane had supervisory authority over Officer Magassouba in the terms and conditions of his employment.

128.    Defendant Lane's actions were taken under color of state law.

129.    Defendant Lane acted with malice or a reckless indifference to Officer Magassouba's federally protected rights.

130.    Officer Magassouba suffered damages because of the racially and sexually hostile work environment created by Defendant Lane.

## COUNT VI
### Defendant Lane's Violation of Article 24 of the Maryland Declaration of Rights

131.    Officer Magassouba incorporates herein by reference the allegations set forth in paragraphs 10 through 80, 104, and 120 through 129.

132.    Article 24 of the Maryland Declaration of Rights affords Officer Magassouba the same rights and protections as those guaranteed to him under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

133.    Defendant Lane's conduct deprived Officer Magassouba of his constitutional rights under Article 24 of the Maryland Declaration of Rights.

134.    Officer Magassouba suffered damages because of the racially and sexually hostile work environment created by Defendant Lane.

## COUNT VII
### Defendants' Unlawful Discrimination Based on Race/Ethnicity, in Violation of 42 U.S.C. § 1981

135.    Officer Magassouba incorporates herein by reference the allegations set forth in paragraphs 10 through 83.

136.    Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981, prohibits employers from intentionally discriminating against employees on the basis of race.

137.    Officer Magassouba is a member of a racial minority. Specifically, he is an African male immigrant.

138.    Defendants Mrotek, Loveday, Walden, and Waddy, in their individual capacities, discriminated against Officer Magassouba with respect to his compensation, terms, conditions, and privileges of employment, as referenced in paragraphs 25, 41, 43, 45, 46, 49, 51, 69, 70, 71, 72, 75, 78, and 80.

139.    Defendant Lane, in her individual capacity, discriminated against Officer Magassouba with respect to his compensation, terms, conditions, and privileges of employment, as referenced in paragraphs 25, 55, 57, 58, 59, 60, 61, 63, 64, 65, and 66.

140.    Officer Magassouba's race was a determinative factor in the decisions taken by Defendants Mrotek, Loveday, Walden, and Waddy.

141.    Officer Magassouba's status as an African male immigrant was a determinative factor in the decisions taken by Defendant Lane.

142.    The actions taken against Officer Magassouba by Defendants Mrotek, Loveday, Walden, and Waddy were done with malice or a reckless indifference to Officer Magassouba's federally protected rights.

143.    The actions taken against Officer Magassouba by Defendant Lane were done with malice or a reckless indifference to Officer Magassouba's federally protected rights.

144.    Officer Magassouba suffered damages as a result of the discriminatory actions taken against him by Defendants.

## COUNT VIII
### Defendants' Unlawful Retaliation,
### in Violation of 42 U.S.C. § 1981

145.    Officer Magassouba incorporates herein by reference the allegations set forth in paragraphs 10 through 83.

146.    Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981, prohibits employers from retaliating against employees for, among other things, making complaints about discrimination based on race, ancestry, or ethnic characteristics.

147.    Officer Magassouba engaged in activity protected under 42 U.S.C. § 1981. Specifically, Officer Magassouba made several complaints regarding the mistreatment he was receiving by supervisors based on his race and his status as an African male immigrant, as referenced in paragraphs 41, 50, 55, 58, 60, 68, 70, 76, and 77.

148.    At the time, or shortly after, engaging in the protected activity, Officer Magassouba was subjected to the materially adverse employment actions referenced in paragraphs 25, 41, 43, 45, 48, 49, 51, 55, 57, 58, 59, 60, 61, 63, 64, 65, 66, 69, 70, 71, 72, 75, 78, and 80.

149.    The adverse employment actions taken against Officer Magassouba by Defendants would have likely dissuaded a reasonable employee in Officer Magassouba's position from engaging in the protected conduct.

150.    Officer Magassouba was subjected to the adverse employment actions because he engaged in the protected activity.

151.    Officer Magassouba suffered damages as a result of the adverse employment actions taken against him by Defendants.

**COUNT IX**
**Racially Hostile Work Environment by Defendants,**
**in Violation of 42 U.S.C. § 1981**

152.    Officer Magassouba incorporates herein by reference the allegations set forth in paragraphs 10 through 83.

153.    Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981, prohibits employers from creating hostile work environments based on an employee's race, ancestry, or ethnic characteristics.

154.    Officer Magassouba was subjected to racially hostile work environment based on the actions taken by Defendants referenced in paragraphs 25, 55, 57, 58, 59, 60, 61, 63, 64, 65, 66, 71, 72, 75, 78, and 80.

155.    Officer Magassouba did not welcome Defendants' conduct.

156.    The actions taken by Defendants Mrotek, Loveday, Walden, and Waddy were motivated by Officer Magassouba's race and/or national origin.

157.    Defendant Lane's conduct was motivated by Officer Magassouba's status as an African male immigrant.

158.    Defendants' conduct occurred frequently, unreasonably interfered with Officer Magassouba's work performance, and created a racially discriminatory abusive working environment for Officer Magassouba that detrimentally affected his health and wellbeing.

159.    Officer Magassouba found Defendants' conduct to be intimidating, hostile, and offensive.

160.    Defendants' conduct created a work environment that a reasonable person in Officer Magassouba's position would have found to be intimidating, hostile, or offensive.

161.    Defendants' supervisors knew, or in the exercise of reasonable care should have known, about the racially hostile work environment.

162.    Defendants' supervisors failed to take prompt remedial action to eliminate the racially hostile work environment.

163.    Officer Magassouba suffered damages because of the racially hostile work environment created by Defendants.

## COUNT X
### Defendants' Unlawful Discrimination, in Violation of Maryland Fair Employment Practices Act

164.    Officer Magassouba incorporates herein by reference the allegations set forth in paragraphs 10 through 83.

165.    The Maryland Fair Employment Practices Act ("MFEPA"), Md. Code Ann., State Gov't § 20-606(a)(1), prohibits employers from failing or refusing to hire, discharge, or otherwise discriminating against an individual with respect to compensation, terms, conditions, or privileges of employment because of an individual's membership in a protected class.

166.    Based on the allegations set forth in paragraphs 86 through 92, Defendants violated Officer Magassouba's rights under the MFEPA to work in an environment free from unlawful discrimination.

167.    Officer Magassouba suffered damages as a result of the actions taken by Defendants that violated his rights under the MFEPA.

## COUNT XI
### Defendants' Unlawful Retaliation, in Violation of Maryland Fair Employment Practices Act

168.    Officer Magassouba incorporates herein by reference the allegations set forth in paragraphs 10 through 83.

169.    MFEPA prohibits an employer from discriminating or retaliating against an employee because the employee opposed any practice that is unlawful under MFEPA.

170.    Based on the allegations set forth in paragraphs 95 through 99, Defendants violated Officer Magassouba's right under the MFEPA to work in an environment free from unlawful retaliation.

171.    Officer Magassouba suffered damages as a result of the actions taken by Defendants that violated his rights under the MFEPA.

<u>**COUNT XII**</u>
**Defendants' Unlawful Harassment,**
**in Violation of Maryland Fair Employment Practices Act**

172.    Officer Magassouba incorporates herein by reference the allegations set forth in paragraphs 10 through 83.

173.    MFEPA prohibits an employer from engaging in harassment of an employee. Md. Code Ann., State Gov't § 20-606(a)(5).

174.    Based on the allegations set forth in paragraphs 103 through 110, Defendants violated Officer Magassouba's right under the MFEPA to work in a non-hostile environment.

175.    Officer Magassouba suffered damages as a result of the actions taken by Defendants that violated his rights under the MFEPA.

<u>**COUNT XIII**</u>
**Defendants' Violation of the Equal Protection Clause of the Fourteenth Amendment**
**(42 U.S.C. § 1983)**

176.    Officer Magassouba incorporates herein by reference the allegations set forth in paragraphs 10 through 83.

177.    A municipality is liable under 42 U.S.C. § 1983 if it deprives an individual of civil rights through an official policy or custom.

178.    Defendants deprived Officer Magassouba of equal protection under the law, in violation of the Fourteenth Amendment, by discriminatorily denying him advancement

opportunities, preferred assignment opportunities, overtime pay, and adequate due process rights, all of which were routinely granted to similarly situated White Officers.

179.    PGCPD's discrimination against officers of color is not new. In 1997, for example, the Hispanic National Law Enforcement Association filed a complaint with the United States Department of Justice ("DOJ") regarding rampant racism within the PGCPD against officers of colors. This systemic conduct continued for decades, leading up to the letter written in October 2016 wherein more than 70 officers employed by the PGCPD signed onto a complaint describing disparities compared to their White counterparts. The complaint included claims of minority officers being passed up for promotions and transfers, as well as allegations of officers being retaliated against or vilified when trying to "expose wrongdoing."

180.    Officer Magassouba was subjected to much of the same racist and vitriol treatment described in the complaint submitted to the DOJ. And Officer Magassouba told by supervisors that he was being racially targeted and mistreated due to his unwillingness to lie to protect Officer Loewke, a White officer.

181.    At all times relevant to the claims herein, Defendant PGC maintained a series of customs, policies, and practices that proximately caused and were likely to lead to the violation of Officer Magassouba's constitutional and civil rights. These acts, omissions, customs, policies, and practices included, among other things, the following:

    a.  Defendants continuing failure to stop, correct, prevent, and eliminate discriminatory disciplinary practices and other discriminatory conditions of employment related thereto. This discrimination was known to or should have been known to the individual Defendants, Defendant PGC, the PGPD, and its policy-making leaders at all times mentioned herein;

    b.  The continuing refusal and/or failure on the part of the individual Defendants, Defendant PGC, the PGCPD, and its policy-making leaders, to fully and adequately stop, correct, or discipline White officers who engaged in acts of

racism, including excessive force and police brutality against Prince George's residents of color, and racism against other PGCPD officers of color;

c.  As evident by the claims asserted herein and those asserted by the individual plaintiffs in HNLEA, et al. v. PGC, et al. (Case No. 8:18-cv-03821), Defendants have a history of engaging in acts of retaliation against police officers like Officer Magassouba who complain of discrimination and racism within and by the PGPD and/or who support officers who complain of discrimination and racism within and by the PGPD;

d.  Defendants maintained, facilitated, and condoned a severe and pervasive hostile work environment that significantly altered the terms and conditions of employment for officers of color; and

e.  Defendants facilitated an environment where officers of color who speak out against racism and/or complain about discrimination within the PGPD are denied promotions and other positions to enhance their careers in the PGPD. Instead, officers of color who complain about discrimination are marginalized and given less prestigious positions within the PGPD.

182.    By the acts and omissions described above, Defendants, while acting under color of state law, have engaged in a longstanding pattern and practice of discriminating against officers of color within the PGCPD by, among other things, maintaining and allowing a racially hostile work environment, subjecting officers of color to disparate disciplinary actions, including but not limited to discrimination in the investigatory/disciplinary process, retaliating against officers complaining of discrimination suffered by themselves or others, and denying promotions to officers of color based on race and/or ethnicity.

183.    Defendants' actions were willful and malicious, and constitute a continuing violation of the Fourteenth Amendment.

184.    As a direct and proximate result of Defendants' actions, Officer Magassouba has been deprived of his civil rights, suffered loss of employment, loss of income, race-based discrimination in job advancement, loss of other employment benefits, and have suffered and continue to suffer emotional distress, humiliation, embarrassment, and damage to his reputation.

## COUNT XIV
### Defendants' Unlawful Conspiracy,
### in violation of 42 U.S.C. §§ 1985 and 1986

185. Officer Magassouba incorporates herein by reference the allegations set forth in paragraphs 10 through 83.

186. By the actions and omissions described above, Defendants conspired among themselves, or with one or more separate persons, to deprive Officer Magassouba of his civil rights, specifically that of equal protection under the law and equal privileges and immunities under the law as a Black officer.

187. Defendants took several affirmative actions in furtherance of the conspiracies, as referenced by the acts and omissions set forth above and incorporated in Counts I through XIII.

188. Defendants knew or should have known about the wrongs conspired to be done against Officer Magassouba.

189. Defendants had the power to prevent or aid in the preventing of the commission of the wrongs conspired to be done against Officer Magassouba.

190. Defendants neglected or otherwise refused to prevent or aid in the prevention of the commission of the wrongs conspired to be done against Officer Magassouba.

191. As a direct and proximate result of Defendants' actions, Officer Magassouba has been deprived of his civil rights, suffered loss of employment, loss of income, race-based discrimination in job advancement, loss of other employment benefits, and have suffered and continue to suffer emotional distress, humiliation, embarrassment, and damage to his reputation.

## PRAYER FOR RELIEF

WHEREFORE, Officer Magassouba respectfully requests that the Court enter judgment on the Complaint, in his favor and against Defendants Prince George's County, Angela Lane, Jeffrey W. Walden, Sunny A. Mrotek, Robbie W. Loveday, and Shawn J. Waddy, as follows:

A.    Award Officer Magassouba appropriate amounts of back pay and front pay, in fair and reasonable amounts to be determined at trial;

B.    Award Officer Magassouba compensatory damages for the harm he suffered as a result of Defendants' conduct, in a fair and reasonable amount to be determined at trial;

C.    Award Officer Magassouba punitive damages against Defendants Lane, Walden, Waddy, Mrotek, and Loveday, in an amount that sufficiently punishes, penalizes, and/or deters their unlawful conduct;

D.    Award Officer Magassouba pre-judgment and post-judgment interest;

E.    Award Officer Magassouba the costs and fees he incurred in pursuing his civil rights claims, including his reasonable attorneys' fees;

F.    Enter an injunction requiring managers and supervisors employed by the PGCPD to complete annual employment discrimination training and cultural sensitivity training, in a manner and format approved by the U.S. Equal Employment Opportunity Commission;

G.    Enter an injunction requiring the Prince George's County Police Department to conspicuously include a summary of the appeal rights and procedures that its employees are entitled to under Sections 16-199 through 16-205 of the Prince George's County Code, whenever the PGCPD takes an action against an employee that invokes said rights; and

\\

\\

H.      Award Officer Magassouba such other relief that the Court deems just and proper.


Dated: March 20, 2023

*/s/ Jordan D. Howlette*
JORDAN D. HOWLETTE
MD Bar No.: 2006110003
Managing Attorney
JD Howlette Law
1140 3rd St. NE
Washington, DC 20002
Tel: (202) 921-6005
Fax: (202) 921-7102
jordan@jdhowlettelaw.com
*Counsel for Plaintiff*
