IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| MOHAMED MAGASSOUBA, | * | |
| Plaintiff, | * | |
| v. | * | Civil No. TJS-23-767 |
| PRINCE GEORGE'S COUNTY, et al., | * | |
| Defendants. | * | |

\*    \*    \*    \*    \*    \*

**MEMORANDUM OPINION**

When a litigant throws claims like spaghetti at the proverbial wall, only a few strands will stick. Plaintiff alleges a dizzying array of discriminatory and retaliatory acts arising from his employment with the Prince George's County Police Department. But merely cataloging perceived workplace grievances does not transform them into actionable civil rights violations. An everything-but-the-kitchen-sink approach to a complaint rarely serves a plaintiff as it only muddles any potentially meritorious claims and burdens judicial resources. *See* Fed. R. Civ. P. 8(a)(2) ("a short and plain statement of the claim showing the pleader is entitled to relief"). After straining through the tangle of fourteen overlapping claims, the Court finds that only a handful present genuine disputes warranting trial.

Pending before the Court is the Motion for Summary Judgment ("Motion") filed by Defendants Shawne Waddy, Sunny Mrotek, Robbie Loveday, Jeffrey Walden, Angela Porter (formerly Lane), and Prince George's County. ECF No. 30.[1] Having considered the submissions

---

[1] In accordance with 28 U.S.C. § 636(c), all parties have voluntarily consented to have the undersigned conduct all further proceedings in this case, including trial and entry of final judgment, and conduct all post-judgment proceedings, with direct review by the Fourth Circuit Court of Appeals, if an appeal is filed. ECF No. 9.

of the parties (ECF Nos. 30, 31, 34 & 37), I find that a hearing is unnecessary. *See* Loc. R. 105.6. For the following reasons, the Motion will be granted in part and denied in part.

### I.  Background

####    A.  Factual Background

This case concerns the employment of Plaintiff Mohamed Magassouba ("Plaintiff") with the Prince George's County Police Department ("PGPD"), his response to a 911 call, and his ultimate termination. Unless otherwise noted, the following facts are not in dispute. To the extent that any facts are in dispute, they will be viewed in the light most favorable to Plaintiff, the non-moving party. *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts.").

Plaintiff, a Black man of African origin, was employed by PGPD beginning in 2010. ECF No. 1 ¶ 21. For nearly nine years, Plaintiff served without incident. But this changed on January 23, 2019, when he was dispatched to respond to a 911 call about two "suspicious looking" individuals. *Id.* ¶ 27. Another PGPD officer, Officer Loewke ("Loewke"), also responded to the call. *Id* ¶¶ 30-38. Loewke arrested a Black woman. *¶¶* 30-35. Her son recorded the arrest, and the video was posted to YouTube. *Id.* ¶ 37. The next day, Plaintiff completed a Witness Narrative Statement describing his observations of the incident.

In February 2019, after the video was posted to YouTube, PGPD Major Waddy (a Black female), PGPD Captain Mrotek (a white male), and PGPD Lieutenant Loveday (a white male) approached Plaintiff. *Id.* ¶ 38. According to Plaintiff, they expressed that they and the PGPD Chief of Police were disappointed in his conduct during the January 23, 2019 incident. *Id.* Loveday told Plaintiff that he should have arrested the arrestee's son to prevent the video from being posted. *Id.*

¶ 39. They also "strongly encouraged [Plaintiff] to change his Witness Narrative Statement so it would support Officer Loweke's use of force." *Id.* ¶ 40. It is not disputed that Waddy, Mrotek, and Loveday approached Plaintiff, but they deny Plaintiff's version of the encounter. ECF No. 13 ¶¶ 38-40. Specifically, the Defendants assert that since the Plaintiff's Witness Narrative Statement indicates that he did not actually see Loewke's use of force, they had no reason to pressure Plaintiff to change it. ECF Nos. 13 ¶¶ 34-35; 30-1 ¶¶ 14-15.

Plaintiff immediately contacted the Fraternal Order of Police ("FOP") to tell his union representatives about the encounter with Waddy, Mrotek, and Loveday, and to inform them about the video posted to YouTube. ECF No. 1 ¶ 41.

Later that day, Plaintiff was informed that he was being reassigned to a desk position. *Id.* ¶ 41. The following day, Plaintiff was informed that he would be sent for retraining at the Police Academy. *Id.* ¶ 44. Two weeks later, Plaintiff reported to the Police Academy. *Id.* ¶¶ 44 & 47. When he reported to the Police Academy, Plaintiff explained the January 2019 incident to the Lieutenant and Corporal in charge of the Police Academy. *Id.* ¶ 47. The Lieutenant and Corporal determined that Plaintiff had "acted properly under the circumstances and told him that there was no legitimate reason to keep him at the Academy." *Id.* They instructed him to return to his unit. *Id.*

Upon his return, the Plaintiff was reassigned to patrol duty under the callsign H5. *Id.* ¶¶ 49-50. Plaintiff considers this patrol assignment to be a "rookie beat." *Id.* Because he was a senior officer, Plaintiff again contacted the FOP to inform his union representatives "that the PGPD was unlawfully targeting him and that he believed the chain of command would soon be retaliating against him based on the current treatment he was receiving." *Id.* ¶ 50.

Plaintiff worked under callsign H5 for three months, during which time he perceived that he was not treated equally compared to other officers. *Id* ¶ 51(b). On one occasion, Plaintiff was

disciplined by Walden for wearing the wrong type of boots to work, even though a non-Black officer was not disciplined for the same violation on the same day. *Id.* ¶ 51(a). Plaintiff and another Black officer complained to Walden of the unequal treatment of Black officers. *Id.* ¶ 51(b). Afterwords, Plaintiff's "work conditions drastically changed" and "[h]e was micromanaged on a daily basis in a way that similar[ly] situated White officers in the squad were not." *Id.*

On March 17, 2019, Plaintiff was transferred to District 5, where he was under the supervision of PGPD Lieutenant Porter (a Black female). *Id.* ¶ 52. Shortly after Plaintiff was assigned to her supervision, Porter allegedly commented that she disliked African men. *Id.* ¶ 52. Defendants deny that Porter made this comment and contend that any similar remarks were made in the context of expressing personal dating preferences rather than racial bias. ECF No. 31 at 5-6. On a separate occasion, Porter told Plaintiff "that she did not trust him as a police officer because of the January 2019 incident involving Officer Loewke," and that she accepted his transfer because she "wanted [Plaintiff] to be obedient to a female supervisor." ECF No. 1 ¶ 54. Defendants again deny this allegation. ECF No. 13 ¶ 54.

Over the next year and a half, Plaintiff contends that Porter made a series of adverse personnel actions against him. In December 2019 or January 2020, Porter partially denied Plaintiff's request for vacation leave. ECF No. 1 ¶ 55-56. Plaintiff complained to the FOP, and the FOP intervened to obtain approval of Plaintiff's requested leave through the chain of command. *Id.* In September 2020, Porter listed Plaintiff Absent Without Official Leave ("AWOL") while he was out sick, even though Plaintiff had submitted a doctor's note to support his sick leave request. *Id.* ¶ 58. And the following month, Plaintiff alleges that Porter sent a supervisor to verify Plaintiff's report that there was no cellular service in an elevator where Plaintiff had been dispatched. *Id.* ¶

59. Porter alleges that she simply dispatched the supervisor to check on Plaintiff's welfare. ECF No. 31 at 4. To Plaintiff, Porter's conduct was belittling and demeaning.

In November 2020, Plaintiff's police vehicle was damaged by a small rock while traveling on the Beltway. Porter had Plaintiff give a duress statement to a subordinate officer regarding the damage, which made Plaintiff uncomfortable and unable to finish the interview. *Id.* ¶ 61. Plaintiff contacted the FOP again, who provided an attorney to represent Plaintiff in a duress statement interview before a supervisor rather than a subordinate officer. *Id.* Plaintiff received a reprimand from Porter for the damage to the vehicle. *Id.* That same month, Porter gave Plaintiff a written reprimand for leaving his weapon at home, but Plaintiff contends that Porter never disciplined other police officers in her squad for the same offense. ECF No. 1 ¶ 63.[2] ECF No. 30-1 at 23. And on two other occasions in November 2020, Plaintiff's requests for overtime pay were denied by Porter, even though he had worked overtime. ECF No. 1 ¶¶ 64 & 66.

According to Plaintiff, Defendants Loveday and Walden told Plaintiff that "he was receiving all these negative actions and mistreatment because he was 'not a team player,'" specifically referring to his "refusal to change his witness statement in connection with the January 2019 incident." *Id.* ¶ 67. Defendants allege that Porter's actions aligned with "appropriate departmental procedure and operational needs," and that Plaintiff "never complained to [Porter] or anyone in his chain of command that he felt harassed at work." ECF No. 30-1 ¶¶ 24-25; *see* ECF No. 31.

---

[2] Defendants deny the Plaintiff was disciplined for leaving his weapon at home. Defendants also dispute Plaintiff's characterization of many of Defendants' actions as "disciplinary." It is not clear from Defendants' filings whether Defendants deny that Plaintiff was reprimanded or whether they deny that the reprimand amounted to "discipline."

In December 2020, Joy Preston, the PGPD Director of Psychological Services, wrote to one of Plaintiff's supervisors, PGPD Captain Ross, expressing concerns about Plaintiff's "elevated levels of stress" related to Porter and how it was affecting Plaintiff's health and quality of life. *Id.* ¶ 68.

Separate from the foregoing issues, in July 2020, PGPD's Internal Affairs Division ("IAD") began investigating Plaintiff "for working at a secondary employment site (night club) when such sites were supposed to be closed by Emergency Order of the County Executive due to COVID 19." ECF No. 30-1 ¶ 26. During the investigation, Plaintiff's identifying information was run through a shared law enforcement database. PGPD Captain David Robinson of the IAD's Special Investigations Response Team, learned that Plaintiff had been arrested twice [3] prior to becoming a police officer. *Id.* Captain Robinson reviewed Plaintiff's Personal History Statement, submitted as part of Plaintiff's application to PGPD, to compare Plaintiff's answers with the results from the law enforcement database. The Personal History Statement included the question:

> Have you ever committed, been charged, detained, or questioned by any law enforcement agency for any of the following crimes. Include any crimes you may have committed but were never caught, suspected of or questioned for.

ECF No. 30-32 at 30. This question was followed by 36 Yes/No checkboxes next to various types of offenses. Plaintiff marked the "No" checkbox for each type of offense. *Id.* Defendants assert that Plaintiff's prior encounters with law enforcement required him to mark "Yes" next to three of the checkboxes in this section of the Personal History Statement. ECF No. 30-1 ¶ 28. The form then asked 22 more questions regarding criminal history, including "Have you ever been arrested or charged with a criminal offense by any law enforcement agency for any reason?" and "In your

---

[3] Plaintiff was arrested on December 6, 2001 by officers with the Alexandria Police Department and on July 1, 2004 by officers with the D.C. Metropolitan Police Department. ECF Nos. 30-30 & 30-31.

lifetime have you ever committed any act, that had you been caught, would have been considered a crime?" ECF No. 30-32 at 32-36. Plaintiff marked "No" for all 22 questions. *Id.* According to Defendants, Plaintiff was again required to mark "Yes" in response to three of those questions. ECF No. 30-1 ¶ 28.

The Personal History Statement instructions warn, "any false statements or intentional omissions . . . shall be cause for . . . immediate termination." ECF No. 30-32 at 2. It also includes a certification that states, "I understand that any discrepancies, misstatements, omissions, and/or falsifications may be cause for . . . immediate termination." *Id.* at 45. The PGPD Chief of Police terminated Plaintiff's employment in August 2021, citing his failure to disclose prior contacts with law enforcement on his Personal History Statement. ECF No. 1 ¶ 80.

Plaintiff alleges that "PGPD instituted the internal investigation against [Plaintiff] because of the complaints he made to Ms. Preston and to the FOP." *Id.* ¶ 70. Defendants claim that the Chief of Police terminated Plaintiff "[a]s a result of failing to report his prior arrests" on his Personal History Statement. ECF No. 30-1 ¶ 31.

### B. Procedural History

Plaintiff brought this case against Defendants under 42 U.S.C. § 1981 ("Section 1981"); Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; the Maryland Fair Employment Practices Act ("MFEPA"), Md. Code, State Gov't § 20-101 *et seq*; the Fourteenth Amendment of the U.S. Constitution, U.S. Const., amend. XIV and 42 U.S.C. § 1983 ("Section 1983"); the Maryland Declaration of Rights, Md. Const. art. XXIV; and 42 U.S.C. §§ 1985 & 1986 ("Section 1985" and (Section 1986"). ECF No. 1.

Count I alleges that Defendants unlawfully discriminated against Plaintiff based on race/ethnicity and national origin, and that Porter discriminated against him based on race/ethnicity, national origin, and gender, in violation of Title VII. ECF No. 1 ¶¶ 84-92.

Count II alleges that Defendants unlawfully retaliated against Plaintiff because he engaged in protected activity, in violation of Title VII. *Id.* ¶¶ 93-100.

Count III alleges that Defendants' conduct created a hostile work environment in violation of Title VII. *Id.* ¶¶ 101-111.

Count IV alleges that Defendants' conduct created a retaliatory hostile work environment in violation of Title VII. *Id.* ¶¶ 112-117.

Count V alleges that Porter discriminated against Plaintiff and created a racially and sexually hostile work environment in violation of the Equal Protection Clause of the Fourteenth Amendment, U.S. Const. amend. XIV, 2, and 42 U.S.C. § 1983. *Id.* ¶¶ 118-130.

Count VI mirrors Count V but is brought under Article 24 of the Maryland Declaration of Rights. *Id.* ¶¶ 131-134.

Count VII alleges that Mrotek, Loveday, Walden, Waddy, and Porter unlawfully discriminated against Plaintiff on the basis of race in violation of Section 1981. *Id.* ¶¶ 135-144.

Count VIII alleges that Mrotek, Loveday, Walden, Waddy, and Porter unlawfully retaliated against Plaintiff because he engaged in protected activity, in violation of Section 1981. *Id.* ¶¶ 145-151.

Count IX alleges that Defendants unlawfully retaliated against Plaintiff because he engaged in protected activity, in violation of Section 1981. *Id.* ¶¶ 152-163.

Counts X through XII mirror Counts I through III but are brought under the MFEPA. *Id.* ¶¶ 164-175.

Count XIII alleges that Defendants are liable under 42 U.S.C. § 1983 violating Plaintiff's Fourteenth Amendment rights. *Id.* ¶¶ 176-184.

Count XIV alleges that Defendants unlawfully conspired to deprive Plaintiff of his civil rights in violation of Section 1985 and neglected to prevent the deprivation of his civil rights in violation of Section 1986. *Id.* at ¶¶ 185-191.

After the close of discovery, Defendants moved for summary judgment. ECF No. 30-1.

## II. Discussion

### A. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If sufficient evidence exists for a reasonable jury to render a verdict for the party opposing the motion, then a genuine dispute of material fact is presented and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Yet the "mere existence of a scintilla of evidence in support of the [opposing party's] position" cannot defeat a motion for summary judgment. *Id.* at 252.

The facts themselves, and the inferences to be drawn from those facts, must be viewed in the light most favorable to the opposing party. *Scott*, 550 U.S. at 378; *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008). A party may not rest on the mere allegations or denials of its pleading but must cite "particular parts of materials in the record" or "show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Supporting and opposing

affidavits are to be made on personal knowledge, contain such facts as would be admissible in evidence, and show affirmatively the competence of the affiant to testify to the matters stated in the affidavit. Fed. R. Civ. P. 56(c)(4).

### B.  Methods of Proof for Discrimination and Retaliation

A plaintiff may establish a claim of employment discrimination under Title VII through one of two avenues of proof. *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007); *see also Foreman v. Weinstein*, 485 F. Supp. 2d 608, 612 (D. Md. 2007).

First, a plaintiff may establish through direct or circumstantial evidence that his race, color, religion, sex, or national origin was a motivating factor in his employer's adverse employment action. *Holland*, 487 F.3d at 213; *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (describing the first avenue of proof as using "ordinary principles of proof using any direct or indirect evidence relevant to and sufficiently probative of the issue.").

Second, a plaintiff may proceed under the burden-shifting framework established in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802 (1973). Under this framework, a plaintiff carries the initial burden to establish a prima facie case for discrimination. *Id.* If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a "legitimate nondiscriminatory reason for [the adverse employment action]." *Id.* If the defendant articulates such a reason, the burden shifts back to the plaintiff show that the reason supplied by the defendant is pretextual, or to provide other evidence of discrimination. *Id.* at 804. The *McDonnell Douglas* burden-shifting framework is also available for claims of retaliation under Title VII. *Foster v. University of Maryland-Eastern Shore*, 787 F.3d 243, 250-51 (4th Cir. 2015) (holding that Plaintiffs may rely on the *McDonnell Douglas* framework to establish a claim of retaliation).

Courts apply Title VII precedent, including the burden-shifting framework, to discrimination, retaliation, and harassment claims brought under the MFEPA and Section 1981. *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) ("This framework was initially developed for Title VII discrimination cases . . . but has since been held to apply in discrimination cases arising under § 1981.") (internal citations omitted); *Passwaters v. Wicomico Cnty.*, No. RDB-18-2923, 2019 WL 6341623, at *25 (D. Md. Nov. 27, 2019)("The same framework governs Plaintiffs' Title VII and S.G. § 20-606 claims.").

The *McDonnell Douglas* framework was "never intended to be rigid, mechanized, or ritualistic." *U.S. Postal Service Bd. Of Governors v. Aikens*, 460 U.S. 711, 715 (1983) (quoting *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577 (1978)). Once an employer presents a legitimate, non-retaliatory justification for its action, courts can bypass analyzing the prima facie case. Instead, they may proceed directly to the ultimate question: whether retaliatory intent actually motivated the adverse employment action. *Id.* ("Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant. The district court has before it all of the evidence it needs to decide whether 'the defendant intentionally discriminated against the plaintiff.'") (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981)); *see also Mandengue v. ADT Sec. Sys., Inc.*, No. ELH-09-3103, 2012 WL 892621, at *16 (D. Md. Mar. 14, 2012) ("It is a common practice of the Fourth Circuit to assume, without deciding, that the plaintiff has established a prima facie case in cases where the employer has proffered evidence of a legitimate reason for its adverse action in its motion for summary judgment.").

11

### C.  Race Discrimination Claims (Counts One, Seven, and Ten)

In Count One, Plaintiff alleges that Defendants discriminated against him because of his race, ethnicity, national origin, and gender in violation of Title VII.[4] ECF No. 1 ¶¶ 84-92. In Count Seven, Plaintiff alleges that Defendants discriminated against him because of his race and ethnicity in violation of Section 1981. *Id.* ¶ 135-144. And in Count Ten, Plaintiff alleges that Defendants discriminated against him because of his membership in a protected class in violation of the MFEPA. *Id.* ¶¶ 164-167. Counts One and Ten are brought against the County and against Porter, Walden, Mrotek, Loveday, and Waddy in their official capacities. Count Seven is brought against Porter, Walden, Mrotek, Loveday, and Walden in their individual capacities. Defendants move for summary judgment as to all of these counts.

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, . . . sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The MFEPA likewise states that "[a]n employer may not fail or refuse to hire, discharge, or otherwise discriminate against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment because of the individual's race, color, [or] national origin." Md. Code, State Gov't § 20-606(a)(1)(i).

Section 1981 provides: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory . . . to the full and equal benefit of all laws . . . as is enjoyed by white citizens[.]" 42 U.S.C. § 1981(a). "Although Section 1981 does not explicitly use the word 'race,' the Supreme Court has construed the statute to ban all racial discrimination in the

---

[4] Plaintiff claims that all Defendants discriminated against him based on his race, ethnicity, and national origin. As to Porter, Plaintiff also claims that she discriminated against him based on his gender.

making of public and private contracts." *Nnadozie v. Genesis Healthcare Corp.*, 730 F. App'x 151, 156 (4th Cir. 2018) (citing *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 609 (1987)); *see also Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459-60 (1975) ("§ 1981 affords a federal remedy against discrimination . . . on the basis of race."). Thus, Section 1981 "bar[s] racial discrimination in the workplace." *Scott v. Lori*, No. ELH-19-2014, 2020 WL 3833129, at *21 (D. Md. July 8, 2020) (citing *Yashenko v. Harrah's N.C. Casino Co., LLC*, 446 F.3d 541, 551-52 (4th Cir. 2006)).

### 1. Defendant Porter and the County

Plaintiff alleges that Porter discriminated against him by:

- denying his leave request in December 2019 or January 2020 (ECF No. 1 ¶¶ 55-56);
- listing him as AWOL when he was out of work sick in September 2020 (*Id.* ¶ 58);
- dispatching him to respond to a call so that another officer could study for an examination (*Id.* ¶ 57);
- sending a supervisor to check on him when he reported that he was out of cell phone or radio service (*Id.* ¶ 61);
- assigning a subordinate officer to take his duress call in November 2020 and subsequently reprimanding him for sustaining damage to his cruiser (*Id.* ¶ 61);
- reprimanding him for leaving his weapon at home (*Id.* ¶ 63); and
- denying Plaintiff's overtime requests in November 2020 (*Id.* ¶¶ 64 & 66).

Plaintiff also alleges that Porter is liable for his termination from PGPD, but he has failed to present any evidence linking Porter to the termination decision. Plaintiff contends in his Response to the Motion that "at the summary judgment stage, it's reasonable to infer that Chief Aziz merely rubber stamped the suspension and termination actions based on the request of the IAD (and Defendant [Porter], who is now the IAD Commander)." ECF No. 34 at 24. But his Response is the first reference to any "request" by Porter to suspend and terminate Plaintiff. *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013) ("It is well-established that parties cannot amend their complaints through

briefing or oral advocacy."). Plaintiff has failed to plead any connection between Porter and the suspension and termination by the PGPD Chief of Police in his complaint, and then when raised for the first time in his Response, it was unsupported by any evidence in the record.

Plaintiff attempts to prove discrimination through both the traditional "direct evidence" avenue of proof and the burden-shifting *McDonell Douglas* framework. As direct evidence of discrimination, Plaintiff alleges that Porter made several discriminatory statements shortly after his transfer to District 5 in March 2019. ECF No. 34-9. Specifically, Plaintiff points to Porter's statement that "she 'disliked' and 'could not tolerate African men' because 'they' are very 'aggressive, controlling, and do not respect women.'" *Id.* ¶ 20. When Plaintiff responded that he was African but he "was not aggressive, controlling, or disrespectful to women," Porter allegedly replied, "you are all the same." *Id.* Porter also allegedly told Plaintiff that she accepted his transfer to her squad "because she wanted [Plaintiff] to be obedient to a female supervisor." *Id.*

Porter denies making these remarks. ECF. No. 31 at 5. She explains: "I interpret his allegation to mean that as a woman I don't like African men for romantic purposes. I am an African American married lesbian female who has no romantic interest in any men, regardless of their race or national origin." *Id.* at 5-6.

Derogatory remarks and offensive language can be direct evidence of discrimination if there is "a nexus between the offensive remark" and an adverse employment action. *Oladokun v. Grafton Sch., Inc.*, 182 F. Supp. 2d 483 (D. Md. 2002). To determine whether such a nexus exists, courts consider: the intervening time between the offensive remarks and the employment action; whether the person who uttered the offensive remarks made or recommended the employment action; whether the contents of the offensive remarks related to the employment action; and the frequency of the remarks. *Id* at 491; *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 608 (4th

Cir. 1999) ("[T]o prove discriminatory animus, the derogatory remark cannot be stray or isolated and '[u]nless the remarks upon which plaintiff relies were related to the employment decision in question, they cannot be evidence of discrimination.'") (quoting *McCarthy v. Kemper Life Ins. Cos.*, 924 F.2d 683, 686 (7th Cir. 1991)). However, "Title VII was not designed to create a federal remedy for all offensive language . . . in the workplace." *Hopkins v. Baltimore Gas & Elec.*, 77 F.3d 745, 754 (4th Cir. 1996).

In *Muldrow v. City of St. Louis*, the Supreme Court clarified that there is a lower bar for "adverse employment action" than the Fourth Circuit and other circuits previously held. 601 U.S. 346, 354 (2024). A plaintiff need not show that the harm caused to him or her was "significant[,] . . . serious, . . . substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." *Id.* at 355. The plaintiff merely needs to show that the employment action negatively impacted the "terms [or] conditions" of his or her employment. *Id.* at 354. While the precise contours of "terms [or] conditions" of employment is not defined, it is broader than the list provided in *Holland*, 487 F.3d at 219; "The 'terms [or] conditions' phrase, we have made clear, is not used 'in the narrow contractual sense; it covers more than the economic or tangible." *Muldrow*, 601 U.S. 346 at 354 (internal quotations and citations omitted).

Defendants argue that Porter's actions do not constitute "adverse actions" for the purposes of an employment discrimination claim because they did not cause "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." ECF No. 30-1 at 24 (quoting *Holland*, 487 F.3d at 219). Defendants also characterize Porter's conduct as "non-disciplinary," alleging that reprimands that are not approved by the IAD are not "disciplinary" and are therefore not "adverse employment actions."  ECF No. 30-1 ¶¶ 23-24. However, Defendants'

15

argument relies on the Fourth Circuit's pre-*Muldrow* standard for "adverse employment action," which is no longer controlling law.[5]

Under the Supreme Court's new standard, the two reprimands by Porter (for failure to wear proper boots and for damage to his police vehicle) are adverse employment actions. This is because both actions could have resulted in adverse notes in Plaintiff's personnel file, which in turn could have limited his future opportunities for professional growth in the PGPD. *See De La Torre v. Fink*, No. PX-23-3203, 2025 WL 460757, at *7 (holding that giving an employee a low performance score is an adverse employment action because it was tied to future compensation and employment opportunities). Porter's denial of Plaintiff's requests for leave and overtime pay are both also adverse employment action because they affect Plaintiff's pay and benefits.

There are no other actions by Porter towards Plaintiff which meet the threshold for adverse employment actions. When Porter dispatched Plaintiff to respond to a call so that another officer could study, it did not negatively impact the terms or conditions of his employment. Neither did sending a supervisor to check on Plaintiff in the field or assigning a subordinate officer to take Plaintiff's duress statement. *See id.* (holding that being made to feel uncomfortable is not an adverse employment action). Because these actions are not "adverse employment actions," they are not actionable under Title VII.

The Court next examines whether a causal connection exists between Porter's adverse employment actions and the derogatory comments towards Plaintiff. No reasonable jury could find such a nexus to exist. While Plaintiff identifies two conversations where Porter made discriminatory remarks, the timing of any subsequent adverse actions undermines any causal link.

---

[5] *Muldrow* was decided by the Supreme Court on April 17, 2024.  The Defendant's Response was filed on July 18, 2024.  ECF No. 34.

Porter's denial of Plaintiff's leave request occurred months after these remarks, and all other challenged actions took place approximately one year later. Even viewing these facts in the light most favorable to Plaintiff, the substantial temporal gaps preclude a reasonable jury from finding the necessary causal connection between Porter's remarks and her later conduct.

In the absence of either a causal connection between Porter's remarks and actions or any other direct evidence of discrimination, Plaintiff must rely on the *McDonnell Douglas* burden-shifting framework.

The Court begins with Plaintiff's prima facie case. A prima facie case for employment discrimination under Title VII, Section 1981, and the MFEPA requires a plaintiff to assert facts that plausibly establish: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Maryland Court of Appeals*, 626 F.3d. 187, 190 (4th Cir. 2010) (describing the elements of a prima facie case of discrimination under Title VII); *Gairola v. Com. of Va. Dep't of Gen. Servs.*, 753 F.2d 1281, 1285 (4th Cir. 1985) ("Under Title VII and either § 1981 or § 1983, the elements of the required prima facie case are the same"); *Passwaters v. Wicomico Cnty.*, No. RDB-18-2923, 2019 WL 6341623, at *25 (D. Md. Nov. 27, 2019) (using the same elements in analyzing plaintiff's prima facie case under the MFEPA as under Title VII).

Defendants challenge Plaintiff's evidence of discriminatory treatment, arguing that Plaintiff fails to establish that employees outside his protected class received more favorable treatment. Plaintiff alleges that Porter:

- never denied sick leave requests submitted in advance by White officers;
- never listed White officers as AWOL in connection with sick leave requests;
- never questioned the truthfulness of other officers' statements regarding lack of radio or cell phone service;
- did not subject White officers to a heightened level of scrutiny and discipline for reporting damage to a police cruiser; and

- never disciplined other police officers for leaving their weapons at home, even though other officers had done so on several different occasions.

A party opposing summary judgment must support any assertions of fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Here, Plaintiff fails to cite any evidence to support his assertions. And he fails to even explain the basis for his belief that Porter "never" treated White officers in the same manner that he alleges she treated Plaintiff. Plaintiff fails to provide a single specific example—let alone one supported by evidence—of a time when a White officer submitted a sick leave request, claimed a lack of cell phone or radio service, sustained damage to a police cruiser, or left a weapon at home and received better treatment from Porter than Plaintiff received. Plaintiff also provides no evidence that he was treated differently from any non-male officers. Plaintiff does allege that a fellow officer told Plaintiff his "status as an African male immigrant was the cause of the inappropriate conduct and mistreatment." *Id.* ¶ 65. Without more support in the record, such an opinion is speculative and conclusory, and not one upon which a jury would be permitted to rely at trial.

"[W]here a plaintiff attempts to rely on comparator evidence to establish circumstances giving rise to an inference of unlawful discrimination, the plaintiff must demonstrate that the comparator is similarly situated in all relevant aspects." *Gaines v. Baltimore Police Dep't*, 657 F. Supp. 3d 708 (D. Md. 2023) (quoting *Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F. App'x 745, 748 (4th Cir. 2017) (internal quotations omitted)). Plaintiff has failed in two ways: (1) he has not demonstrated that he was similarly situated to the White officers who allegedly received different treatment, and (2) he has not provided any identifying information about these purported

comparators. Plaintiff has thus failed to make out a prima facie case of discrimination under Title VII, Section 1981, and the MFEPA.

However, as noted earlier, the *McDonnell Douglas* framework does not require rigid adherence. *Aikens*, 460 U.S. at 715. Once the employer has offered a nondiscriminatory reason for the challenged action, the burden shifts to the plaintiff to show that the reason proffered is pretextual, and the prima facie case is no longer relevant. *Id.*; *see also Angelini v. Baltimore Police Dep't*, 464 F. Supp. 3d 757, 799 (D. Md. 2020). Where Defendants provide such explanations, the question is whether Plaintiff has met the burden to prove that the proffered explanations are pretextual.

Defendants have provided legitimate, nondiscriminatory reasons for each challenged employment action, all based in PGPD procedures. First, they allege that Porter partially denied Plaintiff's initial request for vacation in order to meet PGPD staffing requirements. ECF No. 30-1 at 23. Second, they allege that Porter denied Plaintiff's request for overtime pay because Porter failed to get prior approval. Under such circumstances officers are expected to work fewer hours to balance out the excess hours worked rather than receive overtime pay. ECF No. 31 at 4. Third, they allege that Porter sent a supervisor to check on Plaintiff's welfare when he was out of contact, not to investigate whether Plaintiff was being truthful about lacking cellphone service. *Id*.

As evidence that the proffered reasons for Porter's conduct are pretextual, Plaintiff provides a declaration from PGPD Sergeant Jackson, Plaintiff's immediate supervisor at District 5. Sergeant Jackson attests that Porter "forced [Jackson] to take aggressive disciplinary actions against Officer Magassouba even when [Jackson] thought the disciplinary actions were unwarranted, including writing Officer Magassouba up for common violations that usually [went] undisciplined if committed by other non-Black officers." ECF No. 34-3 ¶ 8. Sergeant Jackson also

attests that he "personally observed [Porter] treat Black officers in our squad in a substantially less favorable manner than the non-Black officers" and that he "believe[s] she was unjustly targeting and singling-out Officer Magassouba in the workplace because he was a Black male." *Id.* ¶¶ 9-10. Plaintiff also relies on deposition testimony from Ms. Preston, the Director of PGPD's Psychological Services Division. ECF No. 34-28. Preston testified that she had received complaints from other officers about Porter, and that all of the other officers who complained were males, and most were Black. *Id.* at 7.

To survive a motion for summary judgment, Plaintiff must produce sufficient evidence for a reasonable jury to find by a preponderence of the evidence that the proffered reasons for Porter's conduct are untrue. *See Causey v. Balog*, 162 F.3d 795, 800 (4th Cir. 1998). For example, a plaintiff may present evidence that the defendant has at different times given inconsistent or contradictory explanations for its conduct, *see Holland*, 487 F.3d at 216, or evidence that the proffered reason is false, *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 244-45 (2000). A court may consider the strength of the plaintiff's prima facie case when considering evidence of pretext as well. *Id.*

Plaintiff's evidence falls short of his burden here. While Sergeant Jackson states that Plaintiff was treated differently by Porter as compared to non-Black officers, Plaintiff provides no evidence and identifies no PGPD officer (regardless of race) regarding any specific incidents to support this statement. As such, they cannot be used as comparators to support an inference of discrimination. Sergeant Jackson attests that he "believe[s] [Porter] was unjustly targeting and singling out [Plaintiff] in the workplace because he was a Black male," but such a statement is inadmissible because it lacks foundation and there is nothing in the record to support his sweeping conclusory assertion. ECF No. 34-3 ¶ 10. *See* Fed. R. Evid. 602 ("A witness may testify to a matter

only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.") & 701 ("If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is…rationally based on the witness's perception"). And nothing in Ms. Preston's and/or Sergeant Jackson's testimony bears specifically on the explanations proffered by the Defendants for their actions toward Plaintiff.

The Court must grant summary judgment to Porter on Counts One, Seven, and Ten. Plaintiff's claims fail for four independent reasons: (1) he has not shown that Porter was responsible for his suspension or termination; (2) he has not established any causal connection between Porter's alleged derogatory comments and the adverse employment actions; (3) he has failed to establish a prima facie case of employment discrimination; and (4) he has not demonstrated that Defendants' legitimate, nondiscriminatory reasons were pretextual. The County is also entitled to summary judgment as to Counts One and Ten insofar as Plaintiff's claims against the County are based upon Porter's conduct.

### 2. Defendants Mrotek, Loveday, Walden, Waddy, and the County

Plaintiff also brings claims against Defendants Mrotek, Loveday, Walden, and Waddy in their official capacities and against the County based on the conduct of those defendants. Plaintiff alleges that:

- Defendants reassigned him from patrol duty to a desk position (ECF No. 1 ¶ 41);
- Defendants required him to attend retraining at the Police Academy (*Id.* ¶ 43);
- Waddy yelled at him for taking sick leave while on desk duty (*Id.* ¶ 45);
- Defendants assigned him a callsign known as a "rookie beat" that places the officer in high-crime areas to obtain more experience, despite being the senior officer on the squad (*Id.* ¶ 51);
- Walden disciplined him for wearing the wrong boots (*Id.* ¶ 51); and
- Walden "micromanaged" him (*Id.*).

Defendants clarify that Waddy alone made the decision to reassign Plaintiff to a desk position and require Plaintiff to attend retraining, and that Walden assigned Plaintiff to the H5

callsign. ECF No. 30-1 at 5-6.[6] Plaintiff alleges that each of those actions constituted discrimination by Defendants. Plaintiff does not present direct evidence to demonstrate that those actions were discriminatory, so he must proceed under the *McDonnell Douglas* burden-shifting framework. *See Burns*, 96 F.3d at 731.

Defendants challenge Plaintiff's prima facie case under Title VII on two grounds: first, that none of the alleged conduct constitutes an adverse employment action, and second, that Plaintiff fails to present sufficient evidence demonstrating disparate treatment compared to similarly situated employees outside his protected class.

Applying *Muldrow*, the Court finds that Waddy yelling at Plaintiff and Walden "micromanaging" him are not adverse employment actions. While perhaps not appropriate behavior by a supervisor in the workplace, these discrete acts did not affect the terms or conditions of Plaintiff's employment. However, Walden's actions in requiring Plaintiff to attend the Police Academy, reassigning Plaintiff to desk duty until retraining was completed, and assigning him to callsign H5 may have affected the terms or conditions of Plaintiff's employment. Each of these actions altered the location of Plaintiff's work and the type of work that he was required to perform, and the prestige of his position. *See Muldrow*, 601 U.S. at 359 (finding that a transfer from an investigative role to an administrative role was an adverse employment action because the latter position was less prestigious); *Tribue v. Maryland*, No. BAH-22-2732, 2024 WL 4202444, at *10 (D. Md. Sept. 13, 2024) (finding denial of assignment to a specialized unit adequate to plead adverse action). The same is so for Walden disciplining Plaintiff for wearing the wrong boots. Plaintiff was given a written "Counseling Memo" in connection with the boots incident, which

---

[6] Therefore, none of the "adverse employment actions" alleged by Plaintiff were taken by Mrotek or Loveday.

created a record of the uniform violation in Plaintiff's personnel file. This record could have potentially hindered Plaintiff's future job growth within PGPD, which affects the terms or conditions of his employment.

Still, Plaintiff's prima facie case fails because he has not provided sufficient evidence that he was treated differently than similarly situated individuals outside of his protected class. Plaintiff names only one non-protected individual, Loewke, to serve as a comparator. Plaintiff alleges that, while he was assigned to callsign H5, Loewke began working at "a unit viewed very favorably by other officers" following the January 2019 use-of-force incident. ECF No. 1 ¶ 43. But Plaintiff provides no information regarding Loewke's disciplinary and employment history or any other information that would allow a factfinder to evaluate whether Plaintiff was similarly situated to Loewke. Other than Loewke, Plaintiff only alleges that he believed he was treated differently from White officers. But Plaintiff does not state the basis for this belief or identify specific non-protected PGPD officers to compare himself. A party opposing a motion for summary judgment must support factual allegations by "citing to particular parts of the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Here, Plaintiff relies on conclusory allegations and unsubstantiated speculation. Because Plaintiff has not demonstrated that he was treated differently than any similarly situated non-protected individuals, he has failed to make out a prima facie case of discrimination.

Nonetheless, Defendants have proffered legitimate reasons for Walden's and Waddy's alleged actions against Plaintiff.[7] Therefore, the question for the Court is whether Plaintiff has

---

[7] As for Mrotek and Loveday, Defendants point out (and Plaintiff does not dispute) that none of the conduct complained of by Plaintiff is attributable to them.

presented sufficient evidence for a reasonable jury to find that Defendants' proffered explanations are pretext for discrimination.

Defendants state that Walden wrote Plaintiff a "Counseling Memo" for wearing boots that did not meet department standards "to put [Plaintiff] on notice of the deficiency so that it did not occur again." ECF No. 30-1 at 5 (noting that Walden had also verbally advised Plaintiff that the same boots were prohibited approximately one week earlier). *Id.* And Defendants allege that Walden assigned Defendant to callsign H5 "due to manpower issues," and furthermore state that "everyone handles H5 at various times." *Id.* at 6. Defendants allege that Defendant Waddy referred Plaintiff to the Police Academy "based on [Officer Waddy's] perceived need to have properly trained officers for the safety of the officer, other officers, and the public." *Id.*

Plaintiff has provided no evidence that these explanations are a pretext for discrimination. ECF No. 34. And Plaintiff has presented no direct or indirect evidence that would allow a reasonable jury to find that these defendants bore discriminatory animus. Without evidence of pretext or evidence of discrimination, no reasonable jury could find in Plaintiff's favor and against Waddy, Mrotek, Loveday, or Walden on Counts One, Seven, and Ten. Defendants are thus entitled to summary judgment on Counts One and Ten for Plaintiff's claims based on the conduct of those defendants.

### 3. Plaintiff's Investigation, Suspension, and Termination

Plaintiff also alleges that the IAD opened an investigation into him, during which time he was suspended and reassigned to perform administrative work as a civilian. And in August 2021, at the conclusion of the investigation, PGPD's Chief of Police terminated Plaintiff's employment. Plaintiff asserts that PGPD's actions—in investigating, suspending, and terminating him—were motivated by discriminatory animus based on his race and national origin. The investigation itself

24

is not an adverse action because "[investigations] have no adverse effect on plaintiff's employment." *Cox v. Red Hat, Inc.*, No. RDA/WEF-23-766, 2024 WL 98162, at *12 (E.D. Va. Jan 9, 2024) (quoting *Mack v. Strauss*, 134 F. Supp. 2d 103, 114 (D.D.C. 2001), *aff'd*, No. 01-5122, 2001 WL 1286263 (D.C. Cir. Sept. 28, 2001). However, the suspension and termination that resulted from the investigation is an adverse employment action that may be actionable under Title VII. *Ware v. Billington*, 344 F. Supp. 2d 63, 76 (D.D.C. 2003) ("[A]lthough the discipline imposed as a result of an investigation may have a sufficiently adverse effect on plaintiff's employment to be actionable, the mere initiation of the investigation does not."). Plaintiff may use evidence of discriminatory intent behind the investigation to support an inference that the ensuing suspension and termination were also motivated by discriminatory intent.

Again, Plaintiff does not present direct evidence for his allegation of discrimination, so he must proceed under the *McDonnell Douglas* burden-shifting framework. *See Burns*, 96 F.3d at 731. Plaintiff has easily satisfied the first three elements of the prima facie case of discrimination when it comes to his suspension and termination: Plaintiff is a member of a protected class, his job performance was satisfactory, and his suspension and termination were adverse employment actions. *See Coleman*, 626 F.3d. at 190. But as to the fourth element of the prima facia case, Plaintiff fails to demonstrate that he was treated differently than similarly situated employees outside his protected class. Still, because Defendants have proffered legitimate nondiscriminatory explanations for PGPD's employment actions against Plaintiff, the Court must consider whether Plaintiff has presented sufficient evidence that would allow a reasonable jury to find that the Defendants' proffered reasons are a pretext for discrimination.

Defendants proffer that PGPD opened an IAD investigation because a liquor board inspector advised that Plaintiff was working secondary employment at a night club during the

COVID-19 pandemic. Plaintiff's secondary employment raised suspicions because, at the time, the County Executive had ordered that all night clubs were to be closed. ECF No. 30-1 at 7. During the investigation, PGPD learned of other infractions committed by Plaintiff: "entering a strip club while on duty; failing to report an automobile accident; . . . recording a conversation he had with [Porter] on his body worn camera without her consent"; and "fail[ing] to disclose two prior arrests on his application for employment with the County Police in response to specific questions about prior police contacts." *Id.* at 7-8.

Defendants submit that IAD Captain Robinson routinely conducted background checks on officers under investigation and compared those results against the officers' self-reported disclosures. *Id.* Defendants also point to their standard employment application, which "specifically advised that failure to answer completely and truthfully would result in termination of employment." *Id.* Defendants state that Chief of Police Malik Aziz, who became Chief in May 2021, decided to terminate Plaintiff when he learned of Plaintiff's failure to truthfully answer the questions on his employment application. *Id.* at 8.

Plaintiff challenges Defendants' explanations for the adverse employment actions and argues that the explanations are a pretext for discrimination. As evidence that the charge of working prohibited secondary employment was pretext to open the IAD investigation into him, Plaintiff argues that he had permission from the PGPD Secondary Law Enforcement Employment Coordinator to work at the site in question. ECF No. 34 ¶ 34. He also provides testimony from the PGPD detective assigned to investigate his case, Cleo Savoy, that secondary employment was not prohibited at the location in question. ECF No. 34-18. And he provides evidence that the charge was ultimately adjudicated as "non-sustained." ECF No. 34-21.

Plaintiff also provides testimony from a former IAD Lieutenant, Sonya Zollicoffer, that "officers of color who filed complaints against other officers, or those who are perceived as unfavorable by their command staff, were often subjected to fishing expeditions on the part of IAD. . . to uncover any possible misconduct in an officer's background that could be relied on to justify disciplinary actions." ECF Nos. 34 at 22-23; 34-22 ¶¶ 12 & 6-7. Ms. Zollicoffer attests that the IAD "often scrutinized officers of color more than their counterparts, which usually resulted in officers of color receiving more severe repercussions for minor or unfounded allegations." ECF Nos. 34 at 23; ECF 34-22 ¶ 8.

Plaintiff also points to the timing of the IAD investigation, which was ten years after the start of his employment with PGPD and soon after Plaintiff first made complaints about how he was being treated at PGPD. ECF No. 34 at 22. As for Chief Aziz's decisions to suspend and terminate Plaintiff, Plaintiff claims that (1) Chief Aziz had only just joined the department when he issued the Notice of Intent of Administrative Action, (2) Chief Aziz "admitted that he never met with [Plaintiff] to discuss the falsification charge/allegation," and (3) Chief Aziz did not review Plaintiff's appeal. Plaintiff argues that "it's reasonable to infer that Chief Aziz merely rubber stamped the suspension and termination actions based on the request of the [IAD] (and [Porter], who is now the [IAD] Commander)." *Id.* at 24.

The IAD report does raise some concerns. The initial allegation against Plaintiff—of working secondary employment at a prohibited site—was not sustained due to lack of evidence of a violation. ECF No. 34-22. Three additional violations (entering a strip club in uniform, recording a conversation with Porter on his Body Worn Camera without her consent, and falsely stating that he had turned on his camera on accident) were also alleged against him and sustained. *Id.* Looking at the IAD report together with Plaintiff's prior conflicts with his supervisors and chain of

command, and viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could find that Defendants subjected Plaintiff to excessive scrutiny in an attempt to find cause to open an IAD investigation into Plaintiff. This raises a genuine dispute of fact as to whether Defendants' proffered reason for opening the investigation against Plaintiff was pretextual. If PGPD was motivated by animus toward Plaintiff's race or national origin in opening the IAD investigation, a reasonable jury could find that the resulting suspension and termination were motivated by the same animus. Accordingly, the County is not entitled to summary judgment on Plaintiff's claims of discrimination in Counts One and Ten relating only to Plaintiff's suspension and termination.

### D. Retaliation Claims (Counts Two, Eight, and Eleven)

In Count Two, Plaintiff alleges that Defendants retaliated against him for engaging in protected activity in violation of Title VII. ECF No. 1 ¶¶ 93-100. In Count Eight, Plaintiff alleges that Defendants retaliated against him in violation of Section 1981 because he made "complaints about discrimination based on race, ancestry, or ethnic characteristics." *Id.* ¶¶ 145-151. Count Eleven asserts the same retaliation claims as Count Two but under the MFEPA. *Id.* ¶¶ 168-171. Counts Two and Eleven are brought against the County and Porter, Walden, Mrotek, Loveday, and Waddy in their official capacities. Count Eight is brought against Porter, Walden, Mrotek, Loveday, and Waddy in their individual capacities.

"Title VII forbids . . . retaliation against an employee for opposing adverse actions that she reasonably suspects to be unlawful under Title VII." *Strothers v. City of Laurel, Maryland*, 895 F.3d 317, 327 (4th Cir. 2018). "MFEPA prohibits an employer from . . . retaliating 'against any of its employees" because that individual has either 'opposed any practice prohibited by [MFEPA]' or 'made a charge testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [MFEPA]." *Hanke v. United Parcel Serv., Inc.*, No. JRR-23-2130, 2024 WL

3554973, at *4 (D. Md. July 26, 2024) (citing Md. Code, State Gov't § 20-506(f)). Retaliation

claims are also cognizable under Section 1981. *CBOCS West, Inc. v. Humphries*, 553 U.S. 442,

448 (2008).

Because Plaintiff does not present direct or indirect evidence of retaliation, he must proceed

under the *McDonnell Douglas* burden-shifting framework. "The elements of a prima facie

retaliation claim under Title VII are: (1) engagement in a protected activity; (2) adverse

employment action; and (3) a causal link between the protected activity and the employment

action." *Coleman*, 626 F.3d at 190. The elements of a prima facie claim of retaliation under Section

1981 and the MFEPA are identical to those under Title VII. *Honor v. Booz–Allen & Hamilton,

Inc.*, 383 F. 3d 180, 188 (4th Cir. 2004) (recognizing that elements of prima facie Section 1981

and Title VII retaliation claims are identical); *Barreto v. SGT, Inc.*, 826 Fed. Appx. 267 (4th Cir.

2020) (applying the same prima facie analysis to Title VII and MFEPA claims).

As protected activities, Plaintiff cites the complaints that he made to the FOP and a letter

that Ms. Preston wrote to Defendants on Plaintiff's behalf, which sought a written plan to remedy

Plaintiff's "elevated levels of stress" at work. ECF No. 1 ¶¶ 95 & 147. Plaintiff also alleges in the

"Background Facts" section of his complaint that Defendants retaliated against him for his "refusal

to lie to cover up the misconduct by Loewke during the January 2019 incident." *Id.* ¶ 79. Although

Plaintiff does not cite his opposition to Loewke's use of force as a "protected activity" in his

retaliation claims, Defendants address this allegation in their Motion as though it had been properly

claimed. Plaintiff alleges the same adverse employment actions in his retaliation claims as in his

discrimination claims described above. *Id.* ¶¶ 96 & 148.

Defendants contend that Plaintiff cannot establish a "but for" causal connection between

his protected activities and Defendants' adverse employment actions. *See Univ. of Tex. Sw. Med.*

*Ctr.* v. *Nassar*, 570 U.S. 338, 360 (2013). That is, Plaintiff must show that the alleged adverse employment action would not have occurred in the absence of the protected activity. *Id.*

### 1. Plaintiff's complaints to the FOP

Plaintiff alleges that he contacted his union representatives at the FOP on five occasions. ECF No. 1 ¶¶ 41 (informing FOP about the use of force incident and the leaked video), 50 (informing FOP that he believed Defendants were unlawfully targeting him and would soon retaliate against him for his conduct during and following the use of force incident), 55 (seeking FOP intervention when Porter partially denied his vacation leave), 58 (seeking FOP intervention when Porter listed Plaintiff AWOL when he was sick) & 61 (seeking legal counsel at FOP in connection with his duress statement interview). Plaintiff does not allege that his complaints to the FOP were in opposition to adverse actions that he reasonably suspected to be unlawful under Title VII. Nor did Plaintiff allege that Defendants were aware of his complaints to the FOP or that Defendants knew the substance of those complaints.

In the Fourth Circuit, courts "have consistently required proof of a decisionmaker's knowledge of protected activity [at the time of the alleged retaliation] to support a Title VII retaliation claim." *Roberts v. Glenn Industrial Grp., Inc.*, 998 F.3d 111 (4th Cir. 2021). The FOP was not Plaintiff's employer, and its knowledge is not imputed to PGPD. And there is no evidence that PGPD knew of any complaints of discrimination that Plaintiff made to the FOP. Without knowledge of Plaintiff's complaints, retaliation by PGPD against Plaintiff for his complaints to the FOP is a legal impossibility.

### 2. Plaintiff's complaints to Joy Preston

Plaintiff also alleges that he "sought mental health services [from Joy Preston] because of the high levels of stress and anxiety he was experiencing from the way he was being treated and

30

managed within the [PGPD] following the posting of the Viral Video." ECF No. 1 ¶ 44. In December 2020, after Plaintiff had been working under Porter's supervision for over one year, Ms. Preston "sent a letter to Capitan [sic] Ross regarding concerns about [Plaintiff's] health and quality of life stemming from 'elevated levels of stress' related to issues connected with Defendant [Porter]." *Id.* ¶ 68. Ms. Preston requested "a written action plan of the steps that will be taken to improve the communication with his chain of command, and what will be done to avoid conflicts in the future." ECF No. 34-27.

Plaintiff argues that the close temporal proximity between the date of Ms. Preston's letter (December 20, 2020), the date when Plaintiff learned about the IAD investigation (December 31, 2020), and the dates of Plaintiff's suspension (January 2021) and subsequent termination (August 2021) is sufficient to demonstrate causation. *See Waag v. Sotera Defense Sols., Inc.*, 857 F.3d 179, 192 (4th Cir. 2017) (holding that the plaintiff "established a prima case of retaliation by showing close temporal proximity between the protected activity at issue . . . and his employer's adverse action").

Importantly, however, Plaintiff only *learned* about the IAD investigation after Ms. Preston's letter. ECF No. 34 at 28. The investigation began soon after the liquor board reported that Plaintiff was working secondary employment at the nightclub in July 2020, which was about five months before Ms. Preston's letter. ECF No. 30-1 at 7. By the time that Ms. Preston sent the letter on which Plaintiff bases his causation argument, the IAD investigation was already well underway. As Plaintiff notes in his Complaint, "other officers in Defendant [Porter's] squad knew about the charges" before Plaintiff was informed of them. ECF No. 1 at 19-20. Thus, temporal proximity alone is insufficient to establish a causal link between Ms. Preston's letter and the IAD investigation.

As to Plaintiff's suspension and subsequent termination, Plaintiff himself admits that these adverse actions "were the natural result" of the IAD investigation. ECF No. 34 at 28. Moreover, Plaintiff does not allege that he complained to Ms. Preston that he was the subject of discrimination. Nor does he allege that Ms. Preston brought any concerns of discrimination to the attention of PGPD. Therefore, Ms. Preston's letter requesting an action plan to address communication failures and conflicts between Plaintiff and his chain of command has no bearing on whether PGPD knew or should have known that Plaintiff may have engaged in protected activity. Plaintiff has failed to establish a causal link between any protected activity and Defendants' adverse employment actions.

### 3. Plaintiff's response to Loewke's use of force

Plaintiff also alleges that Defendants retaliated against him for refusing to support Loewke's use of force in the January 23, 2019 incident. But Defendants submit evidence that "[n]either the internal affairs officer who discovered his falsified employment application or the Chief of Police were even aware of the January 23, 2019, incident." ECF No. 30-1 at 30. Plaintiff has not produced any evidence to the contrary (or any other argument in favor of a causal link between Plaintiff's opposition to the use of force and the employment actions against him). ECF No. 34. No reasonable jury could find that Defendants retaliated against Plaintiff for opposing Loewke's use of force because there is no evidence that the relevant Defendant decisionmakers were even aware of the incident.

Finally, Defendants argue, "[t]o the extent that Magassouba claims retaliation from anything [Porter] did it is unclear what protected activity he claims that he engaged in for which she retaliated against him." ECF No. 30-1 at 30. "Protected activities" under Title VII include oppositional activities that are intended to bring attention to an employer's violations of Title VII

(or reasonable suspicion of such violations). *See EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005); *Boyer-Liberto v. Fontainbleu Corp.*, 786 F.3d 264 (4th Cir. 2015). Title VII prohibits *employment* discrimination. *See* 42 U.S.C. § 2000e-2. Because the civilian who was arrested in the January 2019 incident was not a PGPD employee, Plaintiff could not have reasonably suspected that Loewke's use of force against her or any PGPD support for such use of force was violation of Title VII. Thus, Plaintiff's opposition to the use of force is not a protected activity. Plaintiff therefore cannot rely on his opposition to Loewke's use of force or Defendants' response to his opposition to establish a claim of retaliation.

Because no reasonable jury could find that Plaintiff's protected activities were the "but for" cause of Defendants' adverse employment actions, Defendants are entitled to summary judgment as to Counts Two, Eight, and Eleven.

### E. Harassment and Hostile Work Environment Claims (Counts Three, Nine, and Twelve)

In Count Three, Plaintiff alleges that Defendants subjected him to a hostile work environment based on his race and ethnicity, and that Porter subjected him to a hostile work environment "because of his status as an African male immigrant," in violation of Title VII. ECF No. 1 ¶¶ 101-111. In Count Nine, Plaintiff alleges that Defendants subjected him to a racially hostile work environment in violation of Section 1981. *Id.* ¶¶ 152-163. And in Count Twelve, Plaintiff alleges that Defendants harassed him in violation of the MFEPA. *Id.* ¶¶ 172-175. Counts Three and Twelve are brought against the County and Porter, Walden, Mrotek, Loveday, and Waddy in their official capacities. Count Nine is brought against Porter, Walden, Mrotek, Loveday, and Waddy in their individual capacities.

"Title VII is violated when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive work environment." *Davis v. Kendall*, No. TJS-21-2503, 2022 WL 17668747, at *3 (D. Md. Dec. 14, 2022), *aff'd* No. 23-6149, 2024 WL 1230146 (4th Cir. Mar. 22, 2024) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)) (internal citations omitted). The *McDonnell Douglas* burden-shifting framework does not apply to hostile work environment claims. *See Guessous*, 828 F.3d 208 (applying the *McDonnell Douglas* framework to discrimination and retaliation claims, but not to hostile work environment claims).

In order to sustain a hostile work environment claim, a plaintiff must prove that "(1) the harassment was unwelcome; (2) the harassment was based on [a status protected by Title VII]; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer." *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998). "The elements of a hostile work environment claim 'are the same under either § 1981 or Title VII.'" *Geussous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 221 (4th Cir. 2016) (quoting *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277 (4th Cir. 2004)). The same elements are also used to establish a prima facie case under the MFEPA. *Gibson v. Maryland Motor Vehicle Admin.*, No. BAH-20-3220, 2024 WL 51132, at *7 (D. Md. Jan. 4, 2024). To establish a hostile work environment claim, Plaintiff must also show that the alleged abuse would not have been perpetrated against him "but for" his race or ethnicity. *See Causey*, 162 F.3d at 801.

Plaintiff alleged that Defendants subjected him to a hostile work environment in the following ways:[8]

- Waddy reassigned him from patrol duty to a desk position (ECF No. 1 ¶ 41);
- Waddy, Mrotek, and Loveday required that he attend retraining at Police Academy (*Id.* ¶ 43);

---

[8] For some of the employment actions complained of, Defendants identify the decision-maker responsible for the action, which Plaintiff does not dispute.

- Waddy yelled at him for taking sick leave while on desk duty (*Id.* ¶ 49);
- Walden assigned him to a "rookie beat" (*Id.* ¶ 51);
- Walden disciplined him for wearing improper boots (*Id.*);
- Walden "micromanaged" him (*Id.*);
- Porter denied part of Plaintiff's leave request in December 2019 or January 2020 (ECF No. 1 ¶¶ 55-56);
- Porter listed Plaintiff as AWOL when he was out of work sick in September 2020 (*Id.* ¶ 58);
- Porter dispatched Plaintiff to respond to a call to allow another officer to study for an examination (*Id.* ¶ 57);
- Porter sent a supervisor to check on Plaintiff when Plaintiff reported that he was out of cell phone or radio service (*Id.* ¶ 61);
- Porter assigned a subordinate officer to take Plaintiff's duress call in November 2020 and subsequently reprimanded him for sustaining damage to his cruiser (*Id.* ¶ 61);
- Porter reprimanded Plaintiff for leaving his weapon at home (*Id.* ¶ 63); and
- Porter denied Plaintiff's overtime requests in November 2020 (*Id.* ¶¶ 64 & 66).

Defendants argue that "the facts [Plaintiff] cites were not pervasive enough to alter the conditions of his employment and create an abusive atmosphere." ECF No. 30-1 at 27. It is true that viewing the conduct of certain defendants individually might not give rise to a hostile work environment claim. For example, Plaintiff only cites one incident that involved Mrotek and Loveday: their participation in the decision to refer Plaintiff to the Police Academy following the January 2019 incident. One instance in this context is clearly not "pervasive" harassment, and what occurred is not sufficiently severe to constitute a hostile work environment. However, Plaintiff alleges at least three incidents of conduct directed against him by Waddy, Walden, and Porter. A reasonable jury could find that Defendants' conduct, when viewed as a whole, was sufficiently pervasive to create a hostile work environment. Similarly, a reasonable jury could find that the County tolerated the other defendants' hostility to Plaintiff, such that the other defendants' conduct may be attributed to the County.

To determine whether an employer's conduct amounts to harassment or a hostile work environment, courts look to whether it "unreasonably interferes with an employee's work

performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotations and citations omitted). Plaintiff alleges that Defendants' conduct caused him to experience "elevated levels of stress," which affected his personal life, and caused him to seek mental health services. When Plaintiff sought such services, his healthcare provider was sufficiently concerned to recommend that Plaintiff take a few days off from work (on one occasion) and send a letter to his supervisors to address the problems (on another occasion). Construing the facts in the light most favorable to Plaintiff, he has presented sufficient facts for a reasonable jury to find that Defendants' conduct unreasonably interfered with his work performance and thus altered the conditions of his employment and created a hostile work environment.

Defendants also argue that Plaintiff "has no evidence that any Defendant's conduct was based on his race" and that Plaintiff "either brought [the actions] upon himself" or the actions were a matter of legitimate police management concerns." ECF No. 30-1 at 27. The Court disagrees. Plaintiff has produced evidence that Porter stated that she disliked African men. ECF No. 1 ¶ 53. Plaintiff identifies as an African man. Given Porter's alleged statement, a reasonable jury could conclude that Porter's treatment of Plaintiff constituted harassment and was based on his status as an African man. Likewise, a reasonable jury might take Ms. Preston's testimony that she received complaints about Porter from other officers (all of whom were men and most of whom were Black), *see* ECF No. 34-28, to support an inference that Porter's alleged pervasive mistreatment of Plaintiff was based on his race, national origin, and/or gender. The timing of Walden's alleged increase in hostile conduct is suspicious as well. Plaintiff alleges that after he discussed the unequal treatment of Black officers compared to non-Black officers with Walden, his "work conditions drastically changed" and "[h]e was micromanaged on a daily basis." ECF No. 1 ¶ 51. The proximity between this conversation about Plaintiff's race and the alleged increase in

micromanagement by Walden raises a genuine dispute as to whether Walden would have subjected Plaintiff to the allegedly hostile conduct but for Plaintiff's race.

Because there is sufficient evidence for a reasonable jury to find that Defendants subjected Plaintiff to a hostile work environment because of his race, Defendants are not entitled to summary judgment on Counts Three or Twelve. Porter, Walden, and Waddy are not entitled to summary judgment on Count Nine. Plaintiff did not allege sufficiently pervasive treatment by Mrotek or Loveday to make out a harassment or hostile work environment claim against them in their individual capacities. Mrotek and Loveday are entitled to summary judgment as to Count Nine.

### F. Retaliatory Hostile Work Environment (Count Four)

In Count Four, Plaintiff alleges that Defendants subjected him to a retaliatory hostile work environment in violation of Title VII. ECF No. 1 ¶ ¶ 112-117. Count Four is brought against the County and Porter, Walden, Mrotek, Loveday, and Waddy in their official capacities. To state a hostile work environment claim based on retaliation, a Plaintiff must allege that he experienced retaliatory conduct that "(1) was unwelcome, (2) was sufficiently severe or pervasive that it would dissuade a reasonable worker from making or supporting a charge of discrimination, and (3) can be attributed to the employer." *Laurent-Workman v. Wormuth*, 54 F.4th 201, 218 (4th Cir. 2022) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *Okoli v. City of Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011)). Essentially, a plaintiff asserting a retaliatory hostile work environment claim must establish that the employer's harassment was in retaliation for engaging in protected activity. *See Fordyce v. Prince George's Cnty. Maryland*, 43 F. Supp 537, 552 (D. Md. 2014); *Thorn v. Sebelius*, 766 F. Supp. 2d 585, 600 (D. Md. 2011).

Defendants fail to specifically address Plaintiff's retaliatory hostile work environment claim in their Motion. A Court may not grant summary judgment on grounds not raised by a party

without notice and a reasonable time to respond. *See Coward v. Jabe*, 474 Fed. Appx. 961, 964 (4th Cir. 2012). Because the elements of a retaliatory hostile work environment differ from both retaliation and hostile work environment claims, the Court finds that Defendants have failed to meet their burden to show that they are entitled to judgment as a matter of law on Plaintiff's retaliatory hostile work environment claims. Defendants' Motion will therefore be denied as to Count Four.

### G. Equal Protection Claims (Counts Five, Six, Thirteen, and Fourteen)

In Count Five, Plaintiff alleges that Porter discriminated against him and subjected him to a hostile work environment because of his status as an African male immigrant in violation of 42 U.S.C. § 1983 ("Section 1983") and the Equal Protection Clause of the Fourteenth Amendment. ECF No. 1 ¶¶ 118-130. Count Six alleges that Porter deprived Plaintiff of his rights guaranteed by Article 24 of the Maryland Declaration of Rights. *Id.* ¶¶ 131-134. In Count Thirteen, Plaintiff alleges that the County is liable under Section 1983 for violating the Equal Protection Clause of the Fourteenth Amendment through an official policy or custom.[9] ECF No. 1 ¶¶ 176-184. And in Count Fourteen, Plaintiff alleges that Defendants deprived him of his civil rights under 42 U.S.C. §§ 1985 & 1986. ECF No. 1 ¶¶ 185-191.

Section 1983 is violated when a person acting under color of law causes any other person "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights conferred elsewhere." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (internal quotations omitted). To state a claim under Section 1983, "a plaintiff must allege

---

[9] Count Thirteen is brought against the County and Porter, Walden, Mrotek, Loveday, and Waddy in their official capacities.

(1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of state law.'" *Gaines*, 657 F. Supp. 3d at 748 (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)). Under Section 1983, a person acting under color of state law may only be sued in their individual capacity; there is no respondeat superior liability. *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). While actions against a state under Section 1983 are barred by sovereign immunity, *see Quern v. Jordan*, 440 U.S. 332, 345 (1979), municipal entities such as police departments are considered "persons" for the purposes of Section 1983 liability. *See Gaines*, 657 F. Supp. 3d at 748. However, a viable claim under Section 1983 against a municipal entity must be based upon an "official municipal policy" that causes a violation of the plaintiff's rights. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (2018).

The Equal Protection Clause provides, "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. A plaintiff may have concurrent claims for employment discrimination under Title VII and Section 1983. *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 48-49 (1974). "Courts may apply the standards developed in Title VII litigation to similar litigation under § 1983." *Beardsley v. Webb*, 30 F.3d 524, 529 (4th Cir. 1994) (citing *Boutros v. Canton Regional Transit Auth.*, 997 F.2d 198, 202-03 (6th Cir. 1993)). The Maryland Declaration of Rights states, "no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land." Md. Const. Declaration of Rights art. 24. "[T]he Due Process Clause of [Article 24 of the Declaration of Rights] embodies the concept of equal protection of the laws to the same extent as the Equal Protect Clause of the Fourteenth Amendment." *Murphy v. Edmonds*, 325 Md. 342, 353

39

(1992). When applying Article 24, Maryland courts "have consistently taken the position that the Maryland equal protection principle applies 'in like manner and to the same extent as' the Equal Protection Clause of the Fourteenth Amendment." *Id* at 354 (quoting *Attorney General v. Waldron*, 289 Md. 683, 704-705 (1981)).

Section 1985 prohibits two or more persons from conspiring to deprive "any person . . . of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3). Section 1986 imposes liability on any person who knows of the wrongs "conspired to be done, and mentioned in [42 U.S.C. § 1985], are about to be committed, and having power to prevent or aid in preventing the commission of the same" if that person neglects or refuses to prevent the wrongful act, and the wrongful act is then committed. 42 U.S.C. § 1986.

Defendants argue that Plaintiff's Equal Protection claims fail because Plaintiff fails to provide evidence of similarly situated comparators outside of his protected class. ECF No. 30-1 at 30-31. Without this evidence, they argue, Plaintiff cannot show that he was treated differently than anyone else. Consistent with the reasoning provided above regarding Counts One, Seven, and Ten against Porter,[10] Porter is entitled to summary judgment for Plaintiff's claims of discrimination in Counts Five and Six. Plaintiff has failed to present evidence that would allow a reasonable jury to find (1) that he was treated differently than officers outside his protected class and (2) that Porter's proffered reasons for her actions were pretextual.

However, comparator evidence is not required for hostile work environment claims. Porter is not entitled to summary judgment for Plaintiff's claims of hostile work environment in

---

[10] Count One alleges that Porter is liable under Title VII in her official capacity for discriminating against Plaintiff; Count Seven alleges that Porter is liable under Section 1981 for discriminating against Plaintiff; Count Ten alleges that Porter is liable under the MFEPA in her official capacity for discriminating against Plaintiff.

Counts Five and Six because there exists sufficient evidence in the record for a reasonable jury to find that Porter subjected Plaintiff to a hostile work environment because of his status as an African male immigrant. This is consistent with the Court's analysis regarding Claims Three, Nine, and Twelve.

Plaintiff alleges that the County "maintained a series of customs, policies and practices that proximately caused and were likely to lead to the violation of Officer Magassouba's constitutional and civil rights." ECF No. 1 ¶ 181. While there is no vicarious liability for Section 1983 claims, local governmental bodies may be subject to liability "based on the constitutional violations of individual defendants . . . where those defendants were executing an official policy or custom of the local government." *Whetstone v. Mayor & City Council of Baltimore City*, No. ELH-18-738, 2019 WL 1200555, at *10 (D. Md. Mar. 13, 2019) (citing *Monell*, 436 U.S. at 690-91). "[A] municipal custom may arise if a practice is so persistent and widespread and so permanent and well settled as to constitute a custom or usage with the force of law." *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999) (internal quotations omitted).

Plaintiff alleges that the County has "a history and policy of engaging in acts of retaliation against police officers like [Plaintiff] who complain of discrimination and racism," "maintained, facilitated, and condoned a severe and pervasive hostile work environment," and "facilitated an environment where officers of color who speak out against racism and/or complain about discrimination are denied promotions and other positions to enhance their careers in the PGPD." ECF No. 1 at 35. Defendants have not submitted any argument in support of their Motion as to Count Thirteen. Therefore, Defendants have failed to meet their burden to show that they are entitled to judgment as a matter of law as to Plaintiff's claim under Section 1983 against the County. The County thus is not entitled to summary judgment as to Count Thirteen.

Likewise, Defendants did not address Plaintiff's conspiracy claims in their Motion. Therefore, Defendants' Motion will also be denied as to Count Fourteen.

### H. Duplicative Claims Against Official-Capacity Defendants

Defendants argue that Porter, Mrotek, Loveday, Walden, and Waddy are entitled to summary judgment for Plaintiff's Title VII and MFEPA claims because those statutes impose liability against employers only. ECF No. 30-1 at 20. Because those defendants were not Plaintiff's employer, Defendants argue that the claims are not properly brought against the individual defendants. *Id.* Plaintiff counters that, because the defendants are supervisors named in their official capacities, his claims ultimately impose liability on the County. ECF No. 24 at 25. It is true that employers may be liable under Title VII for supervisors' actions. *See, e.g., Pennsylvania State Police v. Suders*, 542 U.S. 129, 143 (2004). However, Plaintiff names the County itself as in addition to the official-capacity defendants in his claims arising under Title VII and the MFEPA. "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). It is therefore redundant to name both the County and the official-capacity defendants. *Gordan v. Maryland State Police*, No. GLR-22-1699, 2023 WL 6161089, at *6 (D. Md. Sept. 21, 2023). Accordingly, Plaintiff's Title VII and MFEPA claims will proceed against the County only.

Likewise, Plaintiff names Porter, Mrotek, Loveday, Walden, and Waddy in their official capacities as well as the County itself in his Section 1983 claims. As with the MFEPA and Title VII official-capacity claims, the Section 1983 official-capacity claims are redundant of the Section 1983 claim against the County. Plaintiff's Section 1983 claim will also therefore proceed against the County only.

Summary judgment is granted as to Plaintiff's claims against Porter, Mrotek, Loveday, Walden, and Waddy in their official capacities (Count One, Count Two, Count Three, Count Four, Count Ten, Count Eleven, Count Twelve, and Count Thirteen).

## I. Exhaustion of Administrative Remedies

Defendants argue that Plaintiff failed to exhaust his administrative remedies and that his present claims are foreclosed. ECF No. 30-1 at 31. Defendants base this argument on Plaintiff's failure to take advantage of a grievance procedure wherein County employees may appeal disciplinary personnel decisions to the Prince George's County Board of Appeals. *Id. See* Prince George's County, Md., County Code, §16-200(a)(1)(D)(ii) (2013).

Defendants appear to conflate exhaustion of administrative remedies with the doctrine of primary jurisdiction as they use the terms interchangeably and cite cases for both indiscriminately. ECF No. 30-1 at 21-33. Exhaustion of administrative remedies applies where "judicial interference is withheld until the administrative process has run its course." *United States v. Western Pac. R. Co.*, 352 U.S. 59, 64 (1956). Where a statute requires exhaustion of administrative remedies, the claim "is cognizable in the first instance by an administrative agency alone." *Id.* "Primary jurisdiction, on the other hand, applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *Id.* (internal quotations omitted). Despite its name, primary jurisdiction is not jurisdictional but instead a matter of judicial discretion for which there is no fixed formula. "Generally speaking, the doctrine is designed to coordinate administrative and judicial decision-making by taking advantage of agency expertise and referring to issues of fact not within the conventional experience

43

of judges or cases which require the exercise of administrative discretion." *Environmental Technology Council v. Sierra Club*, 98 F.3d 774 (4th Cir. 1996).

In the present case, neither failure to exhaust administrative remedies nor primary jurisdiction justifies dismissal of Plaintiff's claim.

Title VII and the MFEPA require exhaustion of administrative remedies by bringing a charge with the Equal Employment Opportunity Commission ("EEOC"). *See Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247 (4th Cir. 2000). Plaintiff filed a charge with the EEOC on May 26, 2022. ECF No. 1 ¶ 17. So long as a plaintiff files a timely charge with the EEOC, he will be considered to have exhausted his administrative remedies with regard to a claim of employment discrimination "if a reasonable investigation of his administrative charge would have uncovered the factual allegations set forth in formal litigation." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 511 (4th Cir. 2005). Defendants do not allege that Plaintiff's charge was untimely or deficient to uncover the factual allegations set forth in his complaint. And none of Plaintiff's claims require him to complain to the Prince George's County Board of Appeals (or any other forum, besides the EEOC) prior to filing in district court. Therefore, Defendants have not demonstrated that Plaintiff has failed to exhaust his administrative remedies.

Nor is this an appropriate use of the doctrine of primary jurisdiction. *See Environmental Defense Fund v. Wheelabrator Technologies*, 725 F .Supp. 758, 775 (S.D.N.Y. 1989) (quoting *Board of Educ. of City School Dist. v. Harris*, 622 F.2d 599, 607 (2d Cir. 1979), *cert. denied*, 449 U.S. 1124 (1981) ("It is well established that the courts need not defer to an agency where the issue involved is a strictly legal one, involving neither the agency's particular expertise nor its fact finding prowess")); *See also Sierra Club v. DOE*, 734 F. Supp. 946, 951 (D. Colo. 1990) ("Where, as here, the issue is strictly legal, a court need not defer to a state agency"). This case involves

issues arising under state and federal laws and the United States Constitution that are properly within the purview of an Article III court, not the Prince George's County Board of Appeals.

## III. Conclusion

For the reasons set forth above the Motion is **GRANTED IN PART** and **DENIED IN PART**.[11]

This case will proceed to trial on Plaintiff's race discrimination claims against the County related to the IAD investigation and his subsequent suspension and termination (Counts One and Ten); Plaintiff's hostile work environment and harassment claims against the County (Counts Three, Four, and Twelve), Porter (Counts Five, Six and Nine), Walden (Count Nine), and Waddy (Count Nine); Plaintiff's Section 1983 claim against the County (Count Thirteen); and Plaintiff's claims against all Defendants under Sections 1985 and 1986 (Count Fourteen). No other claims will proceed.

Within 14 days of the date of this Memorandum and Order, the parties shall file a joint status report indicating whether they wish to (1) participate in a settlement conference with another magistrate judge or (2) schedule the case for trial.

A separate Order follows.


Date: March 26, 2025                                   /s/
                                        _____
                                        Timothy J. Sullivan
                                        Chief United States Magistrate Judge


---

[11] Given the sweeping span of the Plaintiff's Complaint, and its often difficult to navigate subparts, an Attachment is made a part of this Memorandum Opinion to display in chart form the counts in the Plaintiff's Complaint and the Court's rulings.